2013 Ark. 163

**Joseph Anthony SCAMARDO, Jr., Appellant**

**v.**

**STATE of Arkansas, Appellee.**

**No. CR 12–554.**

Supreme Court of Arkansas.

April 18, 2013.

Rehearing Denied May 23, 2013.

John R. VanWinkle, Fayetteville, for appellant.

Dustin McDaniel, Att'y Gen., Little Rock, by: Nicana C. Sherman, for appellee.

PAUL E. DANIELSON, Justice.

Appellant Joseph Anthony Scamardo, Jr., appeals an order of the Sebastian County Circuit Court finding him guilty of sexual assault in the second degree and sentencing him to 144 months' imprisonment in the Arkansas Department of Correction. Scamardo raises two arguments on appeal: (1) that the circuit court erred by forbidding him from introducing extrinsic evidence of a prior inconsistent statement by the victim, and (2) that the circuit court erred in allowing the victim's father to testify regarding what she had told him about the incident on a prior occasion. We reverse and remand Scamardo's conviction and sentence.

Because Scamardo does not challenge the sufficiency of the evidence against him, only a brief recitation of the facts is necessary. *See, e.g., Riley v. State,* 2012 Ark. 462, 2012 WL 6218479. The charges against Scamardo stemmed from the victim's allegations that in 2008, over Labor Day weekend, she was sexually assaulted by her now stepfather, appellant "Joey" Scamardo. The victim testified at trial about having spent the night at her "Nannie and Poppy['s]" (Scamardo's parents) home in Fort Smith, Arkansas, along with her mother, her two brothers, her stepsister, and Scamardo. She testified that she and her stepsister slept in "a little blow up bed" and that her brothers slept in another bed. The following colloquy took place during her testimony at trial:

Q. Do you remember what you had been wearing to sleep that night?

A. I wore a nightgown and panties.

Q. All right. Can you tell us or tell the jury if something happened that night that you remember?

A. Can you please repeat the question.

Q. Yes. Can you tell us if something happened that night when you were sleeping in there on that bed?

A. Joey, he left his room and he touched me on my private area.

Q. All right. Where were you laying when this happened?

A. I was laying on my bed.

Q. On the bed, okay. Do you know what side of the bed or the mattress that you were on?

A. No.

Q. You said that Joey touched you. Where would he have been when he touched you?

A. I don't—

Q. Where was he in relation to where you were laying when he touched you?

A. Where my legs were.

Q. By where your legs were, is that what you said?

A. (Nods head).

Q. Now, you said on your privates. Can you kind of explain to the jury. You said you had panties on and you had a nightgown on. Was this over your panties or underneath your panties?

A. Underneath.

Q. Underneath your panties, okay. Now, can you kind of explain how that happened if you had your panties on?

A. Joey, he had pulled them down.

Q. And touched you on your privates, you said?

A. (Nods head).

Q. I am going to go back to what I asked you to mark earlier and can you point out on here exactly where he touched you? Can you do that for me?

A. (Indication).

Q. That is the place that you have marked private?

A. (Nods head).

Q. Now, what did he touch you with?

A. His finger.

Q. His finger, okay. Do you know how long he touched you there with his finger?

A. A minute or five seconds, I don't know.

Q. You don't know how long it went on, okay. Do you, did he do anything with his finger when he touched you?

A. Huh uh (witness shakes head).

Q. He just touched you there with his finger?

A. (Nods head).

Q. Did he say anything to you?

A. No.

Q. Did you say anything to him?

A. No.

Q. Why not?

A. I didn't want him to know I was awake.

Q. You were trying to act like you were asleep?

A. (Nods head).

Q. Can you explain what it felt like on there, what his finger felt like on there?

A. It felt kind of wet and uncomfortable.

Q. Can you tell us, you had gone down there to go to sleep; right?

A. Yes, ma'am.

Q. The other kids were there, two were in the other bed. Were there any lights on in the room or in the house?

A. Well, the kitchen light was on.

Q. The kitchen light. Where is the kitchen in relation to this room that you were sleeping in?

A. It was just like the room is here and there is like a wall here, but the kitchen is right here and you kind of see the light.

Q. Is there an entryway or a doorway to this room where you were sleeping?

A. There is just an open hole in the wall.

Q. That is how you got into that room?

A. (Nods head).

Q. Is the kitchen back behind that?

A. (Nods head).

Q. What happened after he touched you?

A. I don't know, I just heard my mom call and Joey, he went in the room and that's all.

Q. He went in what room?

A. He went in his room with mom.

Q. In the bedroom with mom, okay. What did you do after that?

A. Can you repeat the question?

Q. Yes, I'm sorry. What did you do after Joey walked back to the bedroom?

A. I tried to wipe it off, but I couldn't. So I went to the bathroom and used toilet paper to wipe it off, it was uncomfortable.

Q. What were you wiping?

A. My private area.

Q. You were trying to wipe it off. What were you trying to wipe off?

A. Some wet stuff, it felt wet.

In addition to the victim's testimony, her biological father testified that about a month after the incident, he was driving the victim to the court-ordered counseling that she began attending after his divorce from the victim's mother when he noticed that the victim seemed more withdrawn than usual. Her father testified that he spoke with her about making sure to talk about everything she needed to. Her father stated that at that point she told him about Scamardo touching her and that she was very upset, visibly withdrawn, and she was crying. Based on that conversation, he told the counselor when he took her into the appointment, and he called the police. The next day he took her to the Children's Safety Center in Springdale, where she was interviewed and underwent a medical exam.

The sexual-assault nurse examiner from the Children's Safety Center, Sue Stockton, also testified about examining the victim. She testified that her findings from the exam of the victim were normal, which was actually consistent with what the victim said had happened because the allegation was touching. Stockton testified that when the allegations are touching, she does not expect to find anything. She admitted on cross-examination that she could not say anything had happened to the victim, but also could not say that nothing had happened based on her examination.

After the close of all the evidence, the jury found Scamardo guilty of sexual assault in the second degree as previously noted. Scamardo first appealed his conviction and sentence to the Arkansas Court of Appeals. *See Scamardo v. State*, 2012 Ark. App. 392, 2012 WL 2337805. The court of appeals reversed Scamardo's conviction and sentence and remanded for a new trial. The State petitioned this court for review, and we granted that petition on September 6, 2012. When we grant a petition for review, we treat the appeal as if it had been originally filed in this court. *See Fowler v. State*, 2010 Ark. 431, 371 S.W.3d 677. We now turn to the merits.

Scamardo first argues that the testimony of Angelina Wales, the victim's aunt, should not have been excluded because it was proper impeachment testimony under Ark. R. Evid. 613(b). The State contends that the circuit court properly prevented the evidence from being admitted under Ark. R. Evid. 608 and 801 and that a party should not get to use Rule 613 to circumvent basic evidentiary concerns of relevance, prejudice, and confusion. We conclude that the testimony was admissible under Rule 613(b).

The decision to admit or exclude evidence is within the sound discretion of the circuit court, and we will not reverse that decision absent a manifest abuse of discretion. *See Laswell v. State,* 2012 Ark. 201, 404 S.W.3d 818. The abuse-of-discretion standard "is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration." *Grant v. State,* 357 Ark. 91, 93, 161 S.W.3d 785, 786 (2004). Nor will we reverse absent a showing of prejudice. *See Gulley v. State,* 2012 Ark. 368, 423 S.W.3d 569; *Davis v. State,* 350 Ark. 22, 86 S.W.3d 872 (2002).

During Scamardo's cross-examination of the victim, she was asked if she had ever told her mom in front of her Aunt Angelina that she was being made to lie. She testified that she never said that—that she never told them she was being made to lie. However, Scamardo attempted to introduce Angelina Wales's testimony to the contrary. The circuit court found the aunt's statement to be inadmissable hearsay. We disagree and reverse that finding.

Hearsay is an out-of-court statement "offered in evidence *to prove the truth of the matter asserted.*" Ark. R. Evid. 801(c) (2012) (emphasis added). Here, the evidence was not offered to prove the truth of the matter asserted, that the victim was being made to lie. Rather, it was offered as impeachment evidence—to contradict the victim's previous testimony on cross-examination that she never said that to her mother and to attempt to lessen her credibility.

Arkansas Rule of Evidence 613(b)(2012) provides in pertinent part:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon[.]

Pursuant to Rule 613(b), three requirements must be met before extrinsic evidence of a prior inconsistent statement is admissible: (1) the witness must be given the opportunity to explain or deny the inconsistent statement; (2) the opposing party must be given the opportunity to explain or deny the witness's inconsistent statement; and (3) the opposing party must be given the opportunity to interrogate the witness about the inconsistent statement. However, this court has held that when the witness admits to having made the prior inconsistent statement, Rule 613(b) does not allow introduction of extrinsic evidence of the prior statement to impeach the witness's credibility. *See Yankaway v. State,* 366 Ark. 18, 233 S.W.3d 136 (2006); *Kennedy v. State,* 344 Ark. 433, 42 S.W.3d 407 (2001).

On the other hand, where the witness, as was done in the instant case, is asked about a prior statement and either denies making it or fails to remember making it, extrinsic evidence of the prior statement is admissible. *See Kennedy, supra.* This court has concluded that im-

peachment of a witness by introducing extrinsic evidence of a prior inconsistent statement through the testimony of a second witness or through the admission of documentary evidence (regardless of whether the statement was given under oath) must be ₉allowed, otherwise Rule 613(b) would have no meaning. *Kennedy*, 344 Ark. at 447, 42 S.W.3d at 416.

Here, the testimony of Angelina Wales regarding the victim's prior inconsistent statement should have been allowed into evidence as impeachment evidence in accord with Rule 613(b). Both sides had the opportunity to interrogate the victim about the statement, and she was given the opportunity to explain or deny. She clearly denied having made the statement.

Even when appellant has proved error, where the evidence of guilt is overwhelming and the error slight, we can declare the error harmless and affirm. *See Bledsoe v. State*, 344 Ark. 86, 39 S.W.3d 760 (2001). However, we cannot say here that the evidence was so overwhelming as to Scamardo's guilt or that the error was so slight. This is because the main evidence supporting Scamardo's conviction was the victim's testimony and her statements to third parties. Thus, the victim's credibility was presumably a major consideration for the jury. For these reasons, we reverse and remand on this point.

Scamardo further argues that the circuit court erred by admitting hearsay evidence when it allowed the victim's father to testify as to what she had told him about the incident approximately one month after it had occurred. The State avers that the circuit court did not err in allowing the evidence. Although we often do not address a second issue on appeal after holding to reverse and remand on the first issue presented, we will consider the second issue here because it is one likely to recur on retrial. *See T.C. v. State*, 2010 Ark. 240, 364 S.W.3d 53.

₁₀Scamardo contends in his brief that the out-of-court statement by the victim to her father was not made shortly after the offense and was not admissible under the cases cited to the circuit court. That is correct. At trial, the State argued to the circuit court that the testimony should be found admissible under *Bing v. State*, 23 Ark.App. 19, 740 S.W.2d 156 (1987). In *Bing*, our court of appeals stated the following:

> Statements by sex offense victims made to third parties *shortly after the offense* are admissible under any one of three theories. First, third parties may testify as to the victim's "complaint of rape" which proves that the victim did not remain silent (details of the offense are not admissible). Next, testimony by third parties may involve an "excited utterance" by the victim. Finally, third parties may testify as to a "prior consistent statement" made by the victim so long as the victim is present at trial and subject to cross-examination, the victim's credibility has been impeached, and introduction of the testimony otherwise complies with the applicable rules of evidence.

23 Ark.App. at 22, 740 S.W.2d at 157 (emphasis added) (internal citations omitted).

The circuit court applied the first of the three theories and found that the victim's testimony was admissible to show that she did not remain silent. However, in the instant case, the victim's statement to her father was not until roughly one month after the incident. We conclude that the elapsed time period of one month was too long for the testimony in the instant case to be considered "shortly after the offense" as the type of testimony described in *Bing*. Therefore, the circuit court erred in admit-

ting the testimony pursuant to that case law.

The State, for the first time on appeal, additionally argues that the father's testimony was not hearsay and, therefore, did not need to be admitted pursuant to a hearsay exception because it was offered to show the basis of his next actions rather than offered to prove the truth of the matter asserted. The State contends that the testimony was offered to show that ₁₁the victim made the statement, was upset, and what her father did in response to it—his contacting the authorities and his basis for doing so. However, this argument was not presented to the circuit court and was not the basis of the circuit court's ruling. We will not consider arguments that are raised for the first time on appeal. *See MacKool v. State,* 2012 Ark. 287, 423 S.W.3d 28.

For all of the above-stated reasons, we must reverse and remand for a new trial.

Reversed and remanded; Court of Appeals' opinion vacated.

Special Justice BYRON FREELAND joins in this opinion.

HOOFMAN, J., not participating.