KAREN R. BAKER, Associate Justice
On July 12, 2018, in Rogers v. State , 2018 Ark. 242, 550 S.W.3d 387, we affirmed the convictions and sentences of appellant, Edward Darnell Rogers. On July 12, 2018, Rogers filed a petition for rehearing and the State responded. We grant the petition for rehearing and issue the following substituted opinion.
*835 In February 2015, Rogers, was charged with four counts of rape. The victims, L.W., twins Mi.B. and T.B., and Ma.B. were all under the age of eighteen at the time of the alleged offenses. On February 8, 2016, Rogers was convicted by a Pulaski County Circuit Court jury of three counts of rape and sentenced to an aggregate sentence of forty years in prison. Rogers timely appealed to the court of appeals, which reversed and remanded the matter to the circuit court. The State filed a petition for review, and on January 25, 2018, we granted the petition for review. Upon granting a petition for review, this court considers the appeal as if it had been originally filed in this court. Pack v. Little Rock Convention Ctr. & Visitors Bureau , 2013 Ark. 186, at 2-3, 427 S.W.3d 586, 588. On appeal, Rogers presents two issues: (1) There is insufficient evidence to support his rape convictions of Mi.B., Ma.B., and L.W.; and (2) the circuit court erred by not allowing Rogers to impeach L.W. with a crime of dishonesty.
I. Facts
In 2003, Tia Bryant moved to a neighborhood in North Little Rock. Bryant has five children -one adult son and four daughters. The adult son did not live with Bryant. Rogers already resided in the neighborhood-living with his mother across the street from Bryant. The two met and began dating. In 2006, Rogers moved into Bryant's home with her and her four daughters, L.W., twins Mi.B. and T.B., and Ma. B. All four girls testified that Rogers acted as a father to them, took them to and from school, to extracurricular activities, and bought clothes and food for them. All four girls testified that Rogers began touching them inappropriately when they were young teenagers. They each testified to multiple sexual encounters, in their early teens, that included penetration.
At trial, the following evidence was presented. The State called T.B., who was seventeen at the time of the trial, and she testified that she first met Rogers in 2003 when he began dating her mother and eventually moved in with them. She testified that she and her siblings thought of Rogers as a father and called him "Daddy." T.B. further testified that when she was thirteen, Rogers started "kissing and rubbing" on her while she was watching television in the living room late one night when everyone else was asleep. She threatened Rogers that she would tell her mother, and he stopped. T.B. testified that several days after this incident, Rogers set up his blow-up mattress in the living room and asked her to come sit with him. T.B. testified that after kissing T.B. on her face and breasts, Rogers then went out to his car and retrieved a gold condom. T.B. testified that he laid her down on the mattress and penetrated her with his penis. She further testified that she asked Rogers to stop and that she was crying the entire time. T.B. testified that after it was over, Rogers wrapped the used condom in a piece of paper and threw it into the trash. T.B. testified that two or three weeks later, Rogers asked her to go grocery shopping with him, drove to a dead-end street, grabbed a condom from the glove compartment, and again raped her. T.B. testified that he also performed oral sex on her. T.B. testified that Rogers raped her on seven or eight other occasions in her living room, and the rapes stopped when she fifteen or sixteen years old. T.B. stated that she threatened to tell her mother, but Rogers told her that he would hurt her mother and then kill himself.
T.B. further testified that she witnessed Rogers abusing her sisters. One night, she was sleeping in the top bunk of the bedroom that she shared with Mi.B. and Ma.B., and she saw Rogers performing oral *836 sex on Ma.B. On a later date, when it was only T.B. and Mi.B. in the house, T.B. heard a "clapping noise" and saw Rogers in the living room having sex with Mi.B. as Mi.B. was bent over the sofa. T.B. also stated that Rogers had shown her videos of her older sister, L.W., and Rogers having sex with L.W. on the couch. T.B. stated that Mi.B. disclosed the rapes to their mother one afternoon after school in November 2014, and T.B. confirmed that it had happened to T.B. as well. T.B. stated that Rogers had moved to a nearby home in October 2013 and that the abuse stopped at that time, although the family continued to have some contact with him until the allegations of rape were disclosed in 2014.
Next, the State called Ma.B., who was sixteen at the time of trial. She testified that Rogers began touching her inappropriately when she was twelve or thirteen. Ma.B. testified that the first time she was raped, she and her sisters were helping their mother clean a back room of the house and that she was told to go get the broom. When Ma.B. went into the living room, Rogers was masturbating, and he asked her to come over to him. He then grabbed Ma.B.'s hand, placed it on his penis, and told her to move it up and down. Ma.B. stated that a few days later, when no one else was at home, Rogers began kissing and touching her, then he raped her. She testified that he used a condom with a gold wrapper. Ma.B. testified that Rogers raped her at least five times, either in the living room, in her bedroom, or in his car. She stated that on at least one occasion, Rogers had come into her room at night and abused her while her sisters were present. Ma.B. testified that Rogers had also raped her and Mi.B. one time while they were all in the living room. Ma.B. stated that Rogers told her that if she told her mother about the abuse, "it would hurt her." Ma.B. testified she did not disclose the rapes until her sister Mi.B. told their mother. Ma.B. testified that she had loved Rogers and called him "Daddy" prior to the abuse and that she had no reason to lie about it.
Next, the State called Mi.B., who was seventeen at the time of trial; she testified that Rogers had helped raise her and her sisters. Mi.B. testified that when she was thirteen, Rogers pulled out his penis and told her to touch it and she said no. On another occasion, Mi.B. testified that her sister had caught her watching pornography, and Rogers asked her if she wanted to do any of those things from the video with him - she told him no and left the room. Mi.B. testified that one night when everyone else was asleep, Rogers showed her videos of him having sex with different women, and he then proceeded to rape her on the blow-up mattress in the living room. Mi.B. further testified about other times when Rogers raped her on the couch in the living room and in his car with the seat reclined. She testified that there was a total of six to seven rapes over the course of two weeks. According to Mi.B., she had also witnessed Rogers having sexual intercourse with Ma.B. one night while Mi.B. was sleeping next to her. Mi.B. testified that she had told her mother about the abuse while they were in the car one afternoon. She stated that she did not tell her mother earlier because Rogers had threatened to kill himself and hurt her mother. Mi.B. admitted that she had recorded a video recanting the allegations and stating that her mother was just angry with Rogers because he had left her. However, Mi.B. claimed that she had made the video only because she thought she would get paid money and could help her mother, who was struggling financially. Mi.B. testified that she was lying in the videos but not at trial. She admitted on cross-examination that she would lie whenever she felt like it.
*837 The State also called Marlon Raglin, who knew Mi.B. through Raglin's cousin. Raglin testified that Mi.B. had a crush on him and admitted that he had encouraged her to make the video. He stated that he knew Rogers through Deshawn Ford, who lived with Raglin. Raglin claimed that it was actually his cousin and Ford who had pushed Mi.B. to make the video and who had helped her film it. Raglin denied that he had been offered anything from Rogers in return for encouraging Mi.B. to recant the allegations. Raglin testified that Mi.B. had told him long before she made the video that the rapes did not occur and had asked him what to do. Raglin testified that he had told her "to help the guy out."
The State also called Detective Ashley Noel with the North Little Rock Police Department, who testified that she had investigated the allegations against Rogers. She testified that she did not collect any physical evidence from the house because of the length of time between the alleged acts and the filing of charges and because she would have expected to find Rogers's DNA on many items in the house given that he had resided there for years.
The State called L.W., who was twenty-one at trial; she testified that Rogers had lived with her family off and on beginning when she was ten and that she thought of him as a father. She stated that when she was fourteen, Rogers raped her in her bedroom after school when no one else was at home. L.W. also testified about another occasion approximately one month later when he raped her on the couch in the living room. In total, L.W. stated that Rogers had raped her five or six times and that the abuse stopped during her senior year in high school. She testified that she did not see him abuse her sisters and that she did not tell her mother about the rapes until she asked about them in November 2014. L.W. testified that Rogers had threatened to kill her mother and himself if she told anyone.
The State also called Dr. Kristen Long, an emergency room physician at Arkansas Children's Hospital, who testified that she examined T.B., Mi.B., and Ma.B. on December 1, 2014. Dr. Long testified that she did not perform a full genital exam on the girls because the alleged rapes had occurred more than one year prior.
Finally, the State called Bryant. Bryant testified that she had dated Rogers and that he had moved in with her in 2003 or 2004. Bryant testified that Rogers was heavily involved in caring for the girls and that he treated them like daughters. In late 2013, Bryant stated that Mi.B. told her that Rogers had touched her and T.B. inappropriately. Further, Bryant testified that the girls did not disclose at that time that they had been raped. Bryant testified that she confronted Rogers about the alleged inappropriate touching, and he told her that he "had made a mistake" and that it "would not happen again." Bryant testified that soon after this, Rogers moved out of the house although the family continued to have contact with him. Bryant testified that in November 2014, Mi.B. disclosed to her that Rogers had raped her and her sisters and that this was the reason why Mi.B. had recently run away. Bryant testified that she talked to each of the girls, one on one, and that they all confirmed the abuse. Bryant further testified that on the following day, Bryant told Rogers's sister about the girls' disclosure, and they called Rogers on speaker phone from Bryant's car. Bryant stated that Rogers was remorseful and wanted to talk to her, so she went and met with him. Bryant testified that Rogers told her that he had been abused by a relative when he was a boy, and he then threatened to commit suicide. Bryant testified that she encouraged Rogers to turn himself in to the police, and she *838 also warned his mother that he might harm himself. Bryant testified that later that day, after she had picked up the girls from school, Bryant took the girls to the police station where they made a report about the rapes. Bryant testified that the family had struggled financially after Rogers moved out, but she denied that she had encouraged her daughters to fabricate the allegations. Bryant testified that she was not surprised that Rogers picked Mi.B. to offer money in return for recanting her accusations because she was a "follower" and was easily influenced. Bryant further testified that her daughters had experienced a lot of difficulties in overcoming the abuse, including having to be hospitalized for mental breakdowns and suicidal thoughts.
On behalf of the defense, Rogers's sister, Tamara Rogers, testified that she lived with her mother across the street from Bryant. Tamara understood that Rogers had moved out of Bryant's home only because there was no room once Bryant's son's family came to stay with them. Tamara testified that the Bryant family had continued to maintain a close relationship with Rogers until he was arrested on the rape charges. She confirmed that Bryant had told her about the rape allegations before notifying the police and that Bryant had phoned Rogers in her presence to confront him. However, Tamara testified that she listened to their entire conversation and that her brother did not ever admit to the allegations.
Further, additional neighbors and family members of Rogers testified that they had witnessed him interacting with the girls, including in 2014 after Rogers had moved out of Bryant's home, and they testified that they had never noticed any unusual behavior either by the girls or by Rogers. All of these witnesses spoke highly of Rogers and were surprised by the rape charges. Comel Hackett testified that she knew Rogers and that she worked with L.W. at Target. Hackett stated that when she learned about Rogers's arrest, he asked L.W. if Rogers had raped her, and she told him "no."
Finally, Rogers testified in his defense and denied the allegations. Rogers testified that he met Bryant in 2003 or 2004 and moved in with her after several years of dating. He testified that he was a father figure to the girls and denied ever having touched them inappropriately. Rogers testified that he had moved out in October 2013 because some of his money "went missing" and no one confessed to taking it. He testified that Bryant was angry with him for moving out but that, at first, their relationship continued. He also testified that he continued to maintain a relationship with the girls. Rogers stated that the weekend before he was arrested, he was across the street at his mother's house with his new girlfriend, and Bryant kept calling his cell phone. Rogers testified that when he finally spoke with Bryant, she told him to get that "bitch" away from her house. Rogers claimed that Bryant had the girls make up the rape charges because she was mad at him. Rogers testified in his defense and denied all of the allegations. He also testified that he moved out because someone was stealing money from him and that Bryant fabricated the accusations because she was jealous he was seeing someone else.
Following deliberations, the jury convicted Rogers of three counts of rape against Ma.B., Mi.B., and L.W. He was found not guilty of raping T.B. The jury sentenced Rogers to twenty years' imprisonment for raping L.W. and Mi.B. and forty years' imprisonment for raping Ma.B., to be served concurrently. This appeal followed.
*839 II. Points on Appeal
A. Sufficiency of the Evidence
For his first point on appeal, Rogers contends that substantial evidence does not support his convictions and sentences. We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. Whitt v. State , 365 Ark. 580, 232 S.W.3d 459 (2006). When reviewing a challenge to the sufficiency of the evidence, this court assesses the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. Gillard v. State , 366 Ark. 217, 234 S.W.3d 310 (2006). We will affirm a judgment of conviction if substantial evidence exists to support it. Id. Substantial evidence is evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. Ricks v. State , 316 Ark. 601, 873 S.W.2d 808 (1994). Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. Edmond v. State , 351 Ark. 495, 95 S.W.3d 789 (2003). The credibility of witnesses is an issue for the jury and not the court. Burley v. State , 348 Ark. 422, 73 S.W.3d 600 (2002). The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. Id. Upon review, this court's role is to determine whether the jury resorted to speculation and conjecture in reaching its verdict. Ross v. State , 346 Ark. 225, 57 S.W.3d 152 (2001) ; Phillips v. State , 344 Ark. 453, 40 S.W.3d 778 (2001). Finally, "in rape cases, we have held that there is sufficient evidence to support a conviction if the victim gives 'a full and detailed accounting of the defendant's actions.' White v. State , 367 Ark. 595, 599, 242 S.W.3d 240, 249 (2006). Uncorroborated testimony of a rape victim is sufficient evidence to support a conviction. See Gillard v. State , 366 Ark. 217, 234 S.W.3d 310 (2006). Inconsistencies in the rape victim's testimony are matters of credibility that are left for the jury to resolve. See id. The jury may accept or reject testimony as it sees fit. See id. " Ward v. State , 370 Ark. 398, 400, 260 S.W.3d 292, 294-95 (2007).
Rogers was convicted of rape under Ark. Code Ann. § 5-14-103, which provides in pertinent part:
(a) A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person:
(1) By forcible compulsion;
...
(3)(A) Who is less than fourteen (14) years of age.
(4)(A) Who is a minor and the actor is the victim's:
(i) Guardian;
Ark. Code Ann. § 5-14-101, "Definitions," provides in pertinent part:
As used in this chapter:
(3) "Guardian" means a parent, stepparent, legal guardian, legal custodian, foster parent, or any person who by virtue of a living arrangement is placed in an apparent position of power or authority over a minor.
With these standards in mind we turn to Rogers's point on appeal. Rogers asserts that the State failed to present sufficient evidence to support his convictions and sentences. At trial, Rogers moved for directed verdict and renewed the motion based on his argument that
[o]n the count against Ma.B., the State failed to meet a prima facie case in that they've failed to show that Edward Rogers engaged in sexual intercourse or deviate sexual activity with Ma.B. and that Ma.B. was less than 14 years of age at the time of the alleged offense.
*840 ....
On the charge involving T.B., the State failed to make a prima facie case in that they failed to show that Edward Rogers engaged in sexual intercourse or deviate sexual activity with T.B. and that she was less than 18 years of age at the time of the alleged offense. And that Mr. Rogers was ... [T.B.'s] guardian.
....
I'm gonna make the next two motions because they are the same as the T.B. But the State has failed to make a prima facie case that Edward Rogers engaged in sexual intercourse or deviate sexual activity with either Mi.B. or L.W., and that Mi.B. and L.W. were less than 18 years of age at the time of the alleged offense. And that Mr. Rogers was Mi.B.'s or L.W.'s guardian.
In reviewing Rogers's challenge, we note that "this court will not address arguments that are raised for the first time on appeal. Sylvester v. State , 2016 Ark. 136, 489 S.W.3d 146. Furthermore, parties are not permitted to change the grounds for an objection on appeal, but instead are bound by the nature and scope presented at trial. Id. " Marshall v. State , 2017 Ark. 347, at 5, 532 S.W.3d 563, 566. Here, on appeal, Rogers contends for the first time that the evidence failed to support his convictions because of the lack of physical evidence, the delayed reporting, and the credibility of the victims. At trial, he did not make this argument; therefore, the issue is not preserved for appeal and we affirm on this point.
B. Theft-of-Property Conviction
For his second point on appeal, Rogers asserts that the circuit court erred in not allowing Rogers to impeach L.W. with a prior theft conviction. The State asserts that Rogers did not preserve this issue for appeal and any error was harmless. Our standard of review regarding evidentiary rulings is that "the admission or rejection of evidence is left to the sound discretion of the circuit court, and we will not reverse the court's ruling absent a manifest abuse of discretion." Eubanks v. State , 2009 Ark. 170, at 3, 303 S.W.3d 450, 452.
At issue is the circuit court's not allowing Rogers to impeach L.W. with her prior misdemeanor conviction for theft of property. Rule 609(a) of the Arkansas Rules of Evidence provides: "For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted but only if the crime.... involved dishonesty or false statement, regardless of the punishment." During cross-examination of L.W., the following colloquy occurred:
DEFENSE ATTORNEY : At the time it was oh, this only happened in the ninth grade, but since that time you've remembered it happened through the 10th, 11th, and 12th?
L.W.: The more I talk about it, the more I remember.
DEFENSE ATTORNEY : And you said a minute ago the reason you didn't tell anybody because he told you that he would hurt your momma.
L.W.: Correct.
DEFENSE ATTORNEY : You didn't tell them that at all in 2014. Correct?
L.W.: Correct.
DEFENSE ATTORNEY : Did you ever tell Comel Hackett that nothing happened to you, that the rape didn't occur?
L.W.: No.
DEFENSE ATTORNEY : You sure?
L.W.: I'm positive.
DEFENSE ATTORNEY : Okay and you worked with Comel at Target?
L.W.: Yes.
DEFENSE ATTORNEY : Judge, may we approach for a second?
*841 THE COURT : You may.
(Thereupon out of the hearing of the jury, the following conversation took place between counsel and the court):
DEFENSE ATTORNEY : She has a misdemeanor conviction out of 2014 for theft of property. Before I impeach her for that, I want to make sure y'all are objecting on that?
THE STATE : Yes. It's a misdemeanor, and it's over - - I mean, it's over a year old.
DEFENSE ATTORNEY : It's a misdemeanor, but it's in the matter that deals with truthfulness.
THE STATE : Actually that does not. It involved filing a false police report, something like that.
THE COURT : I agree.
Rogers contends that this ruling was an abuse of discretion because theft of property is a crime involving dishonesty and is therefore always admissible under Rule 609(a). The State responds that this argument is not preserved for appeal because Rogers failed to proffer the underlying facts behind the theft conviction and to establish that the crime did, in fact, involve dishonesty or false statement.
With regard to preservation, the admission of evidence of prior convictions involving dishonesty and false statements is not a matter within the discretion of the circuit court; such evidence is always admissible for impeachment purposes and its exclusion is an abuse of discretion. Wal-Mart Stores, Inc. v. Regions Bank Tr. Dep't , 347 Ark. 826, 839, 69 S.W.3d 20, 28-29 (2002). We have consistently interpreted Ark. R. Evid. 609(a) to include theft of property as a crime involving dishonesty. Floyd , 278 Ark. 86, 643 S.W.2d 555 (holding that, because Floyd's convictions for burglary and theft were crimes involving dishonesty pursuant to Rule 609, they were admissible without the weighing test); State v. Cassell , 2013 Ark. 221, 427 S.W.3d 663 (stating that the crime involved in that case was a theft offense, which involves dishonesty); Edwards v. Campbell , 2010 Ark. 398, 370 S.W.3d 250 (holding that misdemeanor theft of property, as defined in Ark. Code Ann. § 5-36-103(a), is a crime of dishonesty); Webster v. State , 284 Ark. 206, 680 S.W.2d 906 (1984) (stating that grand larceny involves dishonesty); James v. State , 274 Ark. 162, 622 S.W.2d 669 (1981) (stating that prior convictions for theft, grand larceny, and forgery all involved dishonesty).
Further, as discussed above, we have held that crimes involving dishonesty, including theft of property, are automatically admissible under Rule 609(a) and that it is not within the discretion of the circuit court to exclude this evidence. Wal-Mart Stores, Inc. , 347 Ark. 826, 69 S.W.3d 20 (citing congressional commentary to Fed. R. Evid. 609(a), which is identical to our rule). We have also explained that such convictions are particularly probative of a witness's credibility. Id. "In short, a person exhibits dishonesty when he or she knowingly takes unauthorized control of someone else's property or obtains that property through deception or threat with the purpose of depriving the owner of the property...." See Edwards , 2010 Ark. 398, at 9-10, 370 S.W.3d 250, 255 ; Floyd v. State , 278 Ark. 86, 643 S.W.2d 555 (1982) ; James , 274 Ark. 162, 622 S.W.2d 669. In other words, the offense at issue here, theft of property, by definition involves dishonesty and is automatically admissible pursuant to Rule 609(a), and Rogers was not required to proffer the conviction. See Edwards , supra. Accordingly, the circuit court abused its discretion by refusing to admit the evidence.
Next, Rogers contends that based on the circuit court's error, we must reverse and remand all three convictions because L.W.'s credibility was critical and *842 material to his defense, there was no physical evidence of the alleged rapes, and his convictions were based solely on the victims' testimony. The State responds that Rogers was not prejudiced by the court's evidentiary ruling and any error was harmless.
Here, the State's case in this matter hinged on one thing-the credibility of the victims, including L.W. There is no other evidence in this case. Simply put, it was a "he said she said" battle between Rogers, his family and neighbors on one side and the victims and their mother on the other. During cross-examination, Rogers questioned L.W. regarding her testimony regarding the alleged rape and L.W.'s conversations with Comel Hackett about the rape. Rogers sought to impeach L.W. because he wanted to convince the jury that L.W. was not credible and to cast doubt on her testimony. The impeachment evidence Rogers sought to introduce concerning L.W. directly relates to her credibility, and her credibility was critical to the question before the jury.
Additionally, Rogers's defense was based on the premise that the four girls, along with Bryant, had conspired to concoct their rape allegations against him. Rogers claimed that they had made up the charges to get even with him for moving out of the home and ending the relationship with Bryant. In the State's closing argument, the State acknowledged the alleged collusion when the prosecutor stated: "The Defendant wants you to believe the victims colluded and planned their stories in order to frame him because [Bryant] was mad." Because all of the victims' allegations were intertwined, we cannot say that the erroneous exclusion of evidence that would have adversely affected L.W.'s credibility would not have also affected the jury's decisions with regard to Mi.B. and Ma.B. It is unknown whether the jury would have concluded that the evidence successfully impeached her credibility or that Rogers's alternative theory was a reasonable one, but the evidence Rogers sought to introduce to impeach L.W.'s credibility satisfied the requirements of Rule 609, and the evidence should have been allowed.
Finally, because the only evidence to support Rogers's conviction was the victims' testimony, the victims' credibility was presumably a major consideration for the jury. See Scamardo v. State , 2013 Ark. 163, 426 S.W.3d 900. In other cases in which the witnesses' credibility is a significant issue, such as in rape or sexual-abuse cases, we have declined to hold that the error was harmless. See, e.g. , Scamardo , supra ; Winfrey v. State , 293 Ark. 342, 738 S.W.2d 391 (1987).
In sum, because all of the girls' allegations were intertwined, the circuit court's error in excluding the evidence cannot be considered slight. The case against Rogers rested solely on the victims' credibility, and the jury had to choose between whether to believe the victims and their mother or Rogers and his friends and family. We cannot say that L.W.'s testimony had no bearing on whether the jury believed Mi.B. and Ma.B., and we reverse Rogers's three rape convictions and remand for a new trial or further proceedings.
Reversed and remanded; court of appeals opinion vacated.
Goodson, Wood, and Womack, JJ., dissent.
A Pulaski County jury convicted Edward Rogers of three counts of rape. Rogers appealed to the court of appeals, which reversed. We granted the State's petition for review and affirmed the circuit court in a 4-3 decision. Rogers v. State , 2018 Ark. 242, 550 S.W.3d 387. Rogers petitioned for *843 rehearing, which the majority, in a break from long-standing precedent, grants. The majority now reverses Rogers's three rape convictions and remands for a new trial. As an initial matter, I would deny Rogers's petition for rehearing. On rehearing, I would affirm his rape convictions.
Petition for Rehearing
Rogers's petition for rehearing fails to comport with or rules for rehearing and thus, should be denied. Arkansas Supreme Court Rule 2-3 prescribes the process for a petition for rehearing.
(g) Entire case not to be reargued. The petition for rehearing should be used to call attention to specific errors of law or fact which the opinion is thought to contain. Counsel are expected to argue the case fully in their original briefs, and the brief on rehearing is not intended to afford an opportunity for a mere repetition on the argument already considered by the Court.
The petitioner must allege a specific error of law or fact within the original opinion, and he is expressly barred from merely repeating arguments already considered by the court. Until now, this court has firmly held to these limits.
Indeed, we have repeatedly stated that we will not consider portions of a petition for rehearing that are "nothing more than repetitions of arguments already considered and dismissed by the court." MacKool v. State , 2012 Ark. 341, at 2, 2012 WL 4321303 (per curiam). In MacKool , we refused to reconsider the same legal error the petitioner had originally raised and that the court had already considered on appeal. In denying the petition, we stated, "Petitioner is simply trying to rehash this argument a second time through his petition for rehearing." Id. at 4. Similarly, an appellant cannot attempt to readdress arguments raised on appeal by citing cases it neglected to cite in its original briefing. See S. Paper Box Co. v. Houston , 15 Ark. App. 176, 183-B, 697 S.W.2d 124, 124 (1985) (applying then Arkansas Supreme Court Rule 20(g) ). When an appellant simply renews his argument by citing cases not referenced in his original brief, the appellate court cannot reconsider his arguments and should deny the petition for rehearing. Id.
Rogers's petition for rehearing fails to comply with the requirements of the rule. He does not allege that our July opinion contains any error of law or fact. In fact, he fails to cite a single legal error. Instead, Rogers challenges the majority's harmless-error application to the facts. Such a challenge is inappropriate in a petition for rehearing. Indeed, I cannot find a single case in which this court has granted rehearing to reconsider the application of the law absent a corresponding challenge to the law itself. Because our rules prohibit a rehearing in this context, not surprisingly, Rogers's petition is also devoid of any such case.
Rogers's ten-page petition for rehearing arguing that harmless error should not apply advances the same argument this court has already considered. On appeal, the State argued that even if the victim's conviction was admissible under Arkansas Rule of Evidence 609, the circuit court's error was harmless because Rogers was not prejudiced. In attempting to reargue this issue, Rogers's petition cites, analyzes, and applies cases that he had ample opportunity to argue previously. Issues that are "repetitive of their original argument on appeal" are "an inappropriate subject for a petition for rehearing ." Fuller v. Johnson , 301 Ark. 14, 19-D, 784 S.W.2d 165, 166 (1990) (emphasis added); Butler Mfg. Co. v. Hughes , 292 Ark. 198, 206-A, 731 S.W.2d 214, 215 (1987) (explaining that a mere repeat of the original argument is an "inappropriate subject for a petition for *844 rehearing"); Barnett v. Ark. Transport Co., Inc. , 303 Ark, 491, 800 S.W.2d 429 (1990) (stating, "arguments that are merely repetitious of those already considered by the court are inappropriate subjects for a petition for rehearing").
Finality matters. Appellate courts should be cautious when exercising their authority to rehear a settled case. To best understand the intention of Rule 2-3, one only needs to look at the rare occasions when the court has exercised its authority to rehear because of an error of law or fact. In Bailey v. Commerce Union Bank , this court granted rehearing to consider an error of law due to an unanticipated change in the law. See 223 Ark. 686, 692, 269 S.W. 2d 314, 318 (1954). After issuing its original majority opinion in Bailey , this court, in a separate case, overruled precedent. That case was the primary precedent relied on for the decision in Bailey . Id. Thus, in light of the unanticipated overruling of precedent, the court granted rehearing to determine whether the result in Bailey would change now that the law had changed. The court also allowed the parties to brief, for the first time, the issue of which state law applied. Id.
The court also granted rehearing in Wilkinson v. James , 164 Ark. 475, 479, 262 S.W. 319, 321 (1924). There, the court had overlooked a stipulation in the record and in briefing that affected the judgment. It granted rehearing to modify the judgment given the stipulation. Neither Bailey nor Wilkinson supports rehearing here. Until now, this court has not granted petitions for rehearing to reapply facts to settled law. Rogers's petition does not fit into the narrow class of cases that are appropriate for rehearing. For over one hundred years this court has refused to broaden its rules for petitions for rehearing.
For these reasons, I would deny Rogers's petition for rehearing.
Harmless Error
On rehearing, I would affirm Rogers's rape convictions for the same reasons the majority of the court explained in Rogers v. State , 2018 Ark. 242, 550 S.W.3d 387. There has been no change in the law nor the facts since we issued this opinion over 3 months ago.
It remains the law that when this court determines that a defendant was denied the opportunity to impeach a witness's credibility, it then considers whether that error was harmless. Winfrey v. State , 293 Ark. 342, 738 S.W.2d 391 (1987). This court has previously found harmless error in rape-conviction appeals. Pigg v. State , 2014 Ark. 433, at 5, 444 S.W.3d 863, 866 (holding on appeal that the court need not determine whether it was error to deny defendant the opportunity to question the victim's credibility when the alleged error would be harmless); Johnston v. State , 2014 Ark. 110, at 8, 431 S.W.3d 895, 899 (holding that erroneous admission of incestuous and pornographic pictures was harmless error in a rape conviction); Kelley v. State , 2009 Ark. 389, at 21, 327 S.W.3d 373, 384 (determining error was harmless in admitting two prior convictions involving indecency with a minor in a rape conviction); Buford v. State , 368 Ark. 87, 91, 243 S.W.3d 300, 303-04 (2006) (finding harmless error when the court erroneously allowed a child-abuse expert to testify as to the victim's credibility in a rape trial). But see Scamardo v. State , 2013 Ark. 163, at 9, 426 S.W.3d 900, 905 (denying a harmless-error argument when the circuit court refused to allow questioning regarding the victim's inconsistent statement as to whether the rape occurred). Here, the circuit court's error fits the harmless-error mold.
An error is harmless when the evidence of guilt is overwhelming, and the error is slight.
*845 Scamardo , 2013 Ark. 163, at 9, 426 S.W.3d at 905. In Buford , the court found evidence of guilt overwhelming when the trial testimony included graphic detail of the rape, the victim testified to the rape, and another witness testified to witnessing the rape. Buford , 368 Ark. at 91, 243 S.W.3d at 303. Here, the evidence that Rogers raped LW is overwhelming. LW testified in specific detail to multiple occurrences of rape. TB testified that she observed a video of Rogers engaged in sex with LW. Moreover, all four victims described what this court emphasized in Kelley when affirming for harmless error as "remarkably similar conduct on the part of [the defendant]." Kelley , 2009 Ark. 389, at 20, 327 S.W.3d at 383. The girls similarly described their sexual encounters with Rogers, including the color of the condom, the dead-end road where he took two of them, and Rogers's suicide threats.
Finally, if Rogers experienced any prejudice, it was slight. Whether an error is slight hinges on the degree to which the defendant was prejudiced. Id. The proposed impeachment testimony of LW, unlike the victim's testimony in Scamardo , did not directly relate to the allegation at hand. Thus, any error was harmless.
For these reasons, I would affirm.
Goodson and Womack, JJ., join in this dissent.
I join Justice Wood's dissent regarding the majority's deeply improvident decision to grant rehearing in this case. I write separately to address Rogers's argument that the circuit court erred by refusing to allow impeachment of L.W. through her prior theft conviction. While the majority faithfully applies this court's established precedent that theft of property is a crime necessarily "involv[ing] dishonesty or false statement" for the purposes of Arkansas Rule of Evidence 609(a)(2), I believe that this precedent-longstanding though it may be-rests on thin reasoning and merits reexamination.
This court's current classification of theft of property goes back nearly four decades to Gustafson v. State , 267 Ark. 278, 590 S.W.2d 853 (1979). There, the court acknowledged that elements of Arkansas Rules of Evidence 608 and 609 are concerned with the distinction between crimes that involve dishonesty per se (e.g., "forgery, perjury, bribery, false pretense and embezzlement") and crimes that do not involve dishonesty per se (e.g., "murder, manslaughter or assault"). Id. at 288-89, 590 S.W.2d at 859. So far, so good. Without analysis, however, the court then reached the abrupt conclusion that "theft, as it is defined in the Arkansas Criminal Code, involves dishonesty." Id.
Then, just as now, the theft statute did not obviously support such a blanket conclusion. The current theft statute has remained substantively identical to the version cited in Gustafson . It identifies two methods of committing theft of property: "(1) tak[ing] or exercis[ing] unauthorized control over or mak[ing] an unauthorized transfer of an interest in the property of another person with the purpose of depriving the owner of the property; or (2) obtain[ing] the property of another person by deception or by threat with the purpose of depriving the owner of the property." Ark. Code Ann. § 5-36-103(a) (Repl. 2013). While the second method clearly concerns conduct that is dishonest per se, it is not at all clear that the first does. Consistently treating the first as the second, as we seem to do with theft, would require allowing the exception contained in 609(a)(2) to swallow the rule. The General Assembly's inclusion of deception as an element of the crime in section (2) while excluding it from section (1) should not be ignored. Furthermore, common sense tells us that there are many ways to commit theft that do not *846 involve dishonesty in any direct way. For instance, the ne'er-do-well who snatches grandma's purse has behaved dishonorably , but not necessarily dishonestly.
Reviewing the typical application of Rule 609(a)(2), it becomes apparent that our treatment of theft is the outlier. West v. State , 27 Ark. App. 49, 766 S.W.2d 22 (1989), provides a useful example. The court of appeals noted that the offense at issue in that case-hindering apprehension-"may be committed in six different ways" of which "[o]nly one involves giving false information." Id. at 52, 766 S.W.2d at 24. Because only some instances of hindering apprehension would fall into the Rule 609(a)(2) exception, the party seeking to use the conviction for impeachment purposes was required to make an "offer of proof as to the factual circumstances involved" in the offense. Id. at 53, 766 S.W.2d at 24. We should consider whether attempts to impeach witnesses with testimony about their theft convictions should require this same minimal factual development. Rule 609(a)(2) is a cabined exception. It does away with both the severity requirements and the balancing of probative value against prejudicial effect typically required to admit convictions for impeachment purposes under Rule 609(a)(1). If a conviction falls under Rule 609(a)(2), it is automatically admissible to impeach credibility; this more permissive standard can be justified only if those convictions genuinely concern the witness's honesty.
Finally, I note that this court has accounted for the concerns I highlight above in its jurisprudence on Arkansas Rule of Evidence 608(b), creating a puzzling tension between two consecutive rules. Rule 608(b) concerns the introduction of instances of conduct "other than conviction of crime as provided in Rule 609" to demonstrate a witness's "character for truthfulness or untruthfulness." In Rhodes v. State , 276 Ark. 203, 634 S.W.2d 107 (1982), and subsequent cases, we have expressly limited Gustafson 's reach in the Rule 608(b) context. In Rhodes , we prohibited the introduction of past instances of shoplifting that did not result in convictions, reasoning that "while an absence of respect for the property rights of others is an undesirable trait, it does not directly indicate an impairment of the trait of truthfulness." Id. at 210, 634 S.W.2d at 111. This results in an uneasy status quo. Theft resulting in a conviction is treated as per se dishonest, and it is therefore admissible under Rule 609(a). Acts of theft not resulting in conviction are not considered probative of truthfulness, and they are therefore not admissible under Rule 608(b). Clever lawyering might construct a compelling difference between truthfulness and honesty, but the apparent strain is more than a plain reading of the rules can comfortably bear.
As outlined above, I believe that this court's precedents holding theft of property to be a crime of dishonesty per se were incorrectly decided. If that is the case, it follows necessarily that evidence of L.W.'s conviction was not automatically admissible under Rule 609(a), that Rogers was required to proffer the conviction to demonstrate that the underlying facts demonstrated dishonesty or false statement, and that the circuit court did not abuse its discretion on this evidentiary question.
I respectfully dissent.