2017 Ark. App. 700

**James Carl PAFFORD, Appellant**

v.

**STATE of Arkansas, Appellee**

No. CR–16–568

Court of Appeals of Arkansas,
DIVISION II.

Opinion Delivered: December 13, 2017

Rehearing Denied January 31, 2018

Benca & Benca, Little Rock, by: Patrick J. Benca, for appellant.

Leslie Rutledge, Att'y Gen., by: Karen Virginia Wallace, Ass't Att'y Gen., for appellee.

MIKE MURPHY, Judge

A Hempstead County jury convicted appellant James Pafford of two counts of rape and two counts of sexual assault in the second degree. Pafford was sentenced to twenty-five years' imprisonment in the Arkansas Department of Correction on each rape conviction, to run consecutively to each other, and five years' imprisonment on each sexual-assault conviction, to run concurrently with the rape convictions. Pafford timely filed a motion for new trial, and the circuit court denied the motion by order. From that order, Pafford appeals.[1] We affirm.

A. *Facts and Procedural History*

Pafford sexually abused then twelve-year-old M.W. on two occasions in February 2015. Both encounters took place at Pafford's home. M.W. confided in his grandmother and a child-abuse-hotline call was made. Because M.W. lived primarily in the same home as Pafford, the call was of high priority and M.W. was immediately interviewed. From there, the investigation continued and was handed over to the state police. Pafford was charged with two counts of rape and two counts of sexual assault in the second degree. On February 9, 2016, the case proceeded to a jury trial where the following testimony was taken.

Odia Russette, a sexual-assault nurse examiner, testified as an expert witness that she examined M.W. pursuant to the sexual-assault allegation. She first took his assault history when M.W. explained that his "[uncle had] been messing with [his] private parts." He detailed the two incidents to Russette. She read the report from the assault-history portion of the exam to the jury:

On the night of the Super Bowl, he told me to go in the bathroom and get it hard and come back and show him. He started messing with it. He started jerking me off. Last Monday I was staying the night with them. He woke me up. He said come here and feel this. He went and got the white pump. . . . He used it to make his stuff, his private parts bigger. He didn't have any clothes on. He pulled my underwear down and started jacking me off and started sucking on it. Then, he started putting his stuff in my face and . . . it was purple and swollen.

After she read the history, Russette testified that she performed a full head-to-toe exam and she opined that the results neither refuted nor confirmed the history.

M.W.'s older brother, G.H., testified. He explained that the Paffords lived three or four houses down from their house and that they celebrated birthdays and holidays together. He testified that when M.W. and his mom were not getting along, M.W. would stay with the Paffords. G.H. said that Pafford told him he could come live with the Pafford family and that he would buy G.H. a truck when he got older. However, G.H. felt uncomfortable and did not want to be there because Pafford would show him "guys' stuff" on Pafford's phone. Another time, G.H. said that he was

1. We note that we originally remanded this case to settle and supplement the record, and the deficiency has now been cured. *See Pafford v. State,* 2017 Ark. App. 281, 2017 WL 1731633.

taking a shower in Pafford's shower that had a clear glass door and that Pafford walked in wanting to see his "stuff." G.H. also cited other conversations in which Pafford would bring up inappropriate sex talk like "[talking] about [G.H.'s] pecker growing a lot."

James Hardman, now twenty-four years old and married with four children, testified that he used to work for the Paffords because he needed money to pay off a fine. Pafford gave him a $1500 advance, a truck, and a phone. The relationship turned sexual when Pafford asked Hardman to make a video exposing his genital area; Pafford would try to touch Hardman's private area over his clothes, and he would ask to suck Hardman's genitals. He also testified to an event where he, Pafford, and a woman were engaged in sexual activity. Hardman was at the house while one of the incidents between M.W. and Pafford took place but was unaware it was happening. He further testified that Carrie Harris, M.W.'s mom, shot him in the arm when she found out he was there. After he had been shot, he quit working for Pafford.

Harris explained that the Paffords had taken care of her and her children by paying the house note, bills, and whatever else they needed. She said that on the night of one of the encounters, she picked up M.W. from Pafford's house and that he smelled like "sexual lubricant." She approached M.W. about the issue, but he became upset and said no. Harris expressed her concerns to her mother (M.W.'s grandmother) and the grandmother approached M.W. about the issue and he confided in her.

Jamien Crozier, now thirty-five years old, testified that when he was a teenager he lived with the Paffords because he came from a broken home. Crozier noted multiple incidents in which he walked in on Pafford and Crozier's friend, Greg Fitcher,

during sexual activity. He said he was about fifteen or sixteen when the first sexual act between him and Pafford happened. He explained,

[It] was almost every day that he was giving sexual advances.... [If] I came in and asked him for something, he always expected something in return. He would always say, "You owe me now." I'd have my shirt off, or something, in the game room, and he'd come over there and try to rub my back and it would steadily advance until I would say, "Get away from me," or "I am not gay." He responded, "I'm not gay, either. This is what friends do for each other."

Corwin Battle also testified for the State, explaining that he works for the Arkansas State Police and is a computer forensic certified examiner. He was called to investigate the claims against Pafford. He testified that the police decided they needed to apply for a search warrant due to M.W.'s allegations that things were photographed and that he was shown things on an electronic device. When the police executed the warrant, they came across a cell phone and retrieved a picture of Pafford's erect penis from the phone. The photograph was admitted but not published to the jury. Battle additionally identified a picture of sex toys that were seized during the search of Pafford's home.

M.W. testified and corroborated the previous testimony. He identified Pafford in the courtroom as his "Uncle James." M.W. explained the two incidents in more detail. M.W. authenticated the picture that Battle had found on the phone by describing the penis as "swole up," "purple and bruised," and he recognized Pafford's body because he was "always in them white socks." The State then published the picture to the jury.

The defense put on three witnesses. The first, Evonne White, had been Pafford's

housekeeper for twelve years. She testified that she never saw or suspected any suspicious sexual activity. G.G., Pafford's grandson, testified that his maternal grandfather had never done anything of a sexual nature to him or, to the best of his knowledge, his friends. Lastly, Jamie Pafford Gresham, Pafford's daughter, testified that her parents were always helping people in need.

After the jury found Pafford guilty of all counts, he acquired new counsel and timely moved for a new trial. Pafford's arguments in support of a new trial were that there was jury misconduct; that an expert should not have been permitted to testify as to the credibility of the victim and his allegations; and that the trial court erred in allowing the introduction of a picture of an erect penis into evidence. He also raised several ineffective-assistance-of-counsel claims.

At the motion hearing conducted on April 1, 2016, Pafford called Latisha James, a juror from the original trial. She explained that her mother had worked for the Pafford family for ten or eleven years and that she would occasionally provide transportation for her mother to and from work. Juror James testified that she divulged this information after the voir dire process, but not that it was for ten or eleven years; that information came out at the motion hearing. Her mother was eventually terminated, but James did not discover the reason until a day before the motion hearing—she had failed a drug test. James testified that her sister also worked for the Paffords for a couple of years. She explained that she was honest and forthcoming with the information she had at the original trial.

Lastly, Pafford called his original attorney, Jeff Harrelson. Harrelson testified that he did not think James was as candid as she should have been regarding her connection with Pafford. Harrelson was asked about the inappropriate picture discovered on Pafford's phone to which he responded that he did his best to keep it out of evidence. He explained that there were several pretrial motions, hearings, and objections regarding the introduction of the picture. Harrelson also answered other questions regarding his trial strategy.

On April 6, 2016, the circuit court denied Pafford's motion for a new trial. Pafford timely appealed from the February 16, 2016 order convicting him on all counts and the April order denying his motion. Pafford raises four points on appeal: (1) jury misconduct prejudiced his chances for a fair trial; (2) the circuit court erred in allowing expert testimony concerning the truthfulness of the victim's statements; (3) the circuit court erred in allowing a photo of Pafford's erect penis into evidence; and (4) the circuit court erred in not granting his new trial based on ineffective-assistance-of-counsel claims.

### B. *Jury Misconduct*

For the first point on appeal, Pafford argues that jury misconduct prejudiced his chances for a fair trial. Specifically, he asserts that James engaged in misconduct because she was not candid regarding her family's relationship to Pafford.

Our supreme court has held that following an allegation of juror misconduct, the moving party bears the burden of proving both the misconduct and that a reasonable possibility of prejudice resulted from it. *State v. Cherry*, 341 Ark. 924, 20 S.W.3d 354 (2000). We will not presume prejudice in such situations. *Id.* The moving party must show that the alleged misconduct prejudiced his chances for a fair trial. *Id.* Whether unfair prejudice oc-

curred is a matter for the sound discretion of the circuit court. *Dimas–Martinez v. State*, 2011 Ark. 515, at 9, 385 S.W.3d 238, 244.

A claim of jury misconduct raised for the first time in a motion for new trial must be accompanied by an affirmative showing that the defense was unaware of the misconduct until after the trial. *See Dimas–Martinez, supra; see also Carter v. State*, 324 Ark. 395, 921 S.W.2d 924 (1996). In *Dimas–Martinez*, the supreme court addressed whether the issue of juror misconduct related to a sleeping juror was preserved for appeal. 2011 Ark. 515, 385 S.W.3d 238. There, the appellant's counsel put the court on notice that she was concerned that a juror had slept through some technical testimony, and there was no way for that juror to recoup that testimony. *Id.* Appellant's counsel asked three times that the juror be removed based on the fact that he had fallen asleep and missed testimony. *Id.* The circuit court denied the requests. *Id.* On appeal, the supreme court held that the issue was properly preserved for review because the appellant properly raised a challenge to the juror's sleeping and obtained a ruling on the request for the juror to be removed. *Id.*; *cf. Carter v. State*, 324 Ark. 395, 921 S.W.2d 924 (1996) (explaining that where the defense was aware of the sleeping juror and did nothing to correct the situation, the issue was not preserved for appeal).

Here, appellant did not make any allegations of juror misconduct at trial; the issue was first presented to the circuit court by way of a motion for new trial. Before any evidence was presented in the original case, but after voir dire, James asked to speak to the court, and she informed it that she recently remembered that her mother used to work for appellant.

The following colloquy occurred on the record:

JAMES: Okay, after she got to talking about how where their (sic), I guess their office is on 16th Street, I got to thinking after I left, and I called my mom. My mom used to work for 'em. She used to work for Pafford that's on 16th Street.

. . .

PROSECUTOR: Do you think that if there was sufficient evidence because, you know, I'm not trying to say anything about your mother, I'm just saying if there was sufficient evidence to vote guilty and you did and he was convicted, would that cause any problem or awkwardness between you and your mother?

JAMES: No, no.

PROSECUTOR: Has she told you anything? Do you have some information about Pafford, like his history or how—

JAMES: Well, as far as him, I don't. You know, I don't know anything, really, about them. I just know of 'em just like everybody, else, in town.

PROSECUTOR: Do you—any of that knowledge, would that have any effect on you one way or the other?

JAMES: No, ma'am.

. . .

COURT: Do you have any questions?

DEFENSE: Just one. The information that you gained after talking to your mother, would that change any of the answers that you gave us during your questioning, yesterday?

JAMES: No, I just asked her—I just come out and asked her, I said, "Didn't you used to work on 16th Street?" She said, "Yes." "What was the name of that place?" 'Cause it never clicked in my head until she said 16th Street.

PROSECUTOR: Did your mother, did she say anything to you about what she hopes the results are or—

JAMES: No, I didn't even tell her what I'm here for. Yeah, she don't know what I'm here for.

. . .

COURT: I think that you'll be fine. You were straightforward coming to us, and I appreciate it.

Following this interaction, James remained on the jury with no objection from Pafford. Because Pafford did not object, even despite having alternate jurors available at trial, this issue is not preserved for appeal.

Regardless, Pafford fails to justify any misconduct and merely repeats unfounded accusations that require speculation. Nothing in the record indicates that James had reason to be upset with Pafford. James, on her own, brought the connection to the court's attention rather than covering up the relationship. We find no prejudice or abuse of discretion because James was straightforward that she had a connection with Pafford and that she was rehabilitated.

### C. *Expert–Witness Testimony*

■ For the second point on appeal, Pafford argues that the circuit court erred by allowing expert witness Russette—the nurse who conducted M.W.'s sexual assault examination—to "testify that the victim was telling the truth regarding the sexual assault." At trial, Russette testified that she is a board-certified, registered nurse with a master's degree in nursing. She further explained that she is a certified sexual-assault nurse examiner. Based on these credentials, the State moved to qualify Russette as an expert in the field of sexual assault. With no objection from Pafford, the circuit court granted the State's motion.

■ We review the admission of expert testimony under an abuse-of-discretion standard. *Miller v. State*, 2010 Ark. 1, 362 S.W.3d 264. In discussing our standard of review for evidentiary rulings, the Arkansas Supreme Court has said that circuit courts have broad discretion and that a circuit court's ruling on the admissibility of evidence will not be reversed absent an abuse of that discretion. *Id.* To qualify as an abuse of discretion, the circuit court must have acted improvidently, thoughtlessly, or without due consideration. *Id.* Additionally, this court will not reverse an evidentiary ruling absent a showing of prejudice. *Purdie v. State*, 2010 Ark. App. 658, at 7, 379 S.W.3d 541, 546.

■ It is error for the court to permit an expert, in effect, to testify that the victim of a crime is telling the truth. *Hill v. State*, 337 Ark. 219, 988 S.W.2d 487 (1999). Pafford likens his case to *Johnson v. State*, 292 Ark. 632, 732 S.W.2d 817 (1987). In *Johnson*, the supreme court reversed a conviction, holding that the admission of a physician's opinion that a child had been sexually abused was prejudicial error. The physician's opinion was based only on the history given to him by the child and was not corroborated by his physical examination of the alleged victim. *Id.* There, the physician testified that he found no physical evidence of the alleged anal intercourse that the boy said had taken place that day. *Id.* The doctor testified that his opinion was based on the history the child gave him and his experience dealing with children through the years. *Id.* The appellant argued that the negative physical exam and the oral history were the only bases the physician could have had for his opinion. *Id.* The supreme court ruled that the circuit court erred in admitting the testimony. *Id.*

Unlike *Johnson*, however, Russette explained her encounter and procedure with M.W. in an objective manner. She read from her report and stated her conclusion

from the physical examination, which she explicitly testified "neither confirmed or refuted" the oral history M.W. provided her. Pafford mischaracterizes Russette's testimony as bolstering M.W.'s credibility. Instead, her testimony was clinical in nature. Upon Pafford's objection to the testimony at the trial, the court conducted a bench conference to discern both arguments and ultimately overruled the objection. Based on these facts, we cannot say the circuit court acted thoughtlessly and abused its discretion.

### D. *Prejudicial Photo*

For the third point on appeal, Pafford argues that the circuit court erred in allowing a photo of his penis into evidence. Matters pertaining to the admissibility of evidence are left to the sound discretion of the circuit court; such a ruling will not be reversed absent an abuse of that discretion nor absent a showing of prejudice, which is not presumed. *Coger v. State*, 2017 Ark. App. 466, at 13, 529 S.W.3d 640, 649.

Rule 401 of the Arkansas Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ark. R. Evid. 401. Arkansas Rule of Evidence 402 further provides that "[e]vidence which is not relevant is not admissible." Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Ark. R. Evid. 403. However, the State is entitled to prove its case as conclusively as it can. *Turner v. State*, 2014 Ark. App. 428, at 3, 439 S.W.3d 88,

89. Merely cumulative evidence is not prejudicial, and corroborating evidence may withstand Rule 403's balancing test. *Id.*

Pafford argues that the probative value of the photo was outweighed by the danger of unfair prejudice. The State asserts that the photo corroborated M.W.'s statement that he was sexually abused. We agree. Though most of the evidence in this case was inflammatory to a certain extent, the photo is relevant to bolster M.W.'s allegations and testimony; it helps prove his truthfulness. While the photo is shocking and prejudicial, it corroborated M.W.'s testimony that Pafford used a pump, which made his penis swollen and purple. Notably, the photo featured unique characteristics that M.W. authenticated.

Additionally, Pafford argues that the picture was introduced to show that he was engaged in a homosexual act with another man. We are not persuaded by this speculation, because the record is rife with testimony from more than one witness who discussed Pafford's sexuality. Overall, we cannot say the court abused its discretion in allowing this picture.

### E. *Ineffective Assistance of Counsel*

For the final point on appeal, Pafford asserts two ineffective-assistance-of-counsel claims. Particularly that (1) counsel should have objected to Crozier's testimony about Greg Fitcher because it violated the Confrontation Clause and (2) counsel failed to object and move for mistrial when prejudicial statements were made. In the interest of judicial economy, this court will review claims of counsel's ineffectiveness on direct appeal provided that the allegation is raised before the circuit court (i.e., in a motion for new trial) and that the facts and circumstances surrounding the claim have been fully developed. *See Dodson v. State*, 326 Ark. 637, 642, 934 S.W.2d 198, 201 (1996).

We do not reverse a denial of postconviction relief unless the circuit court's findings are clearly erroneous. *Harris v. State*, 2017 Ark. App. 381, at 4, 526 S.W.3d 43, 47. A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Id.*

The benchmark question to be resolved in judging a claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Norris v. State*, 2013 Ark. 205, 427 S.W.3d 626. A Rule 37 petitioner's ineffective-assistance-of-counsel claims are analyzed under the two-prong standard as set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Lowe v. State*, 2012 Ark. 185, 423 S.W.3d 6. Under the *Strickland* test, a claimant must show that counsel's performance was deficient, and the claimant must also show that the deficient performance prejudiced the defense to the extent that the appellant was deprived of a fair trial. *Id.* A claimant must satisfy both prongs of the test, and it is unnecessary to examine both components of the inquiry if the petitioner fails to satisfy either requirement. *See Pennington v. State*, 2013 Ark. 39, 2013 WL 485660 (per curiam). A petitioner claiming ineffective assistance must first show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed to the petitioner by the Sixth Amendment to the United States Constitution. *Walton v. State*, 2013 Ark. 254, 2013 WL 2460191 (per curiam). There is a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance, and an appellant has the burden of overcoming this presumption by identifying specific acts or omissions of trial counsel that, when viewed from counsel's perspective at the time of the trial, could not have been the result of reasonable professional judgment. *Id.*

In order to meet the second prong of the test, a claimant must show that there is a reasonable probability that the factfinder's decision would have been different absent counsel's errors. *Delamar v. State*, 2011 Ark. 87, 2011 WL 693579 (per curiam). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.*

## F. Confrontation Clause

Pafford asserts that his counsel made a variety of hearsay objections during Crozier's testimony concerning Fitcher—who was unavailable to testify because he died before trial—but that counsel failed to object on the basis that Crozier's testimony violated the Confrontation Clause. In a criminal prosecution, a defendant has a right to confront the witnesses against him or her. *See, e.g., Brisher v. State*, 2016 Ark. App. 488, 505 S.W.3d 223. For hearsay statements to be admissible against a defendant at a criminal trial, two separate requirements must be met. *See Crawford v. Washington*, 541 U.S. 36, 60, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (noting statements that fall under firmly rooted hearsay exceptions are not exempt from scrutiny under the Confrontation Clause). First, an exception to the general rule prohibiting hearsay must be demonstrated. Second, the admission of the hearsay cannot violate the defendant's Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. amend. 6.

 Here, the Confrontation Clause was not at issue. Crozier testified that Greg Fitcher was one of his best friends and was the one who introduced him to Pafford. At one point, both Crozier and Fitcher lived with the Paffords. Crozier testified that a few times he would walk into a room and Fitcher and Pafford would be under the covers together. He explained that while he never saw them masturbate each other, whenever he walked into a room they would stop and act guilty. Additionally, Crozier said that anytime Fitcher walked into a room and saw Pafford messing with him that Fitcher would push Crozier out of the way and "would take the grunt of the force." Crozier explained that Pafford would make him and Fitcher participate in "masturbation contests." He testified that he and Fitcher "cried on each other's shoulders many nights," but Crozier's testimony did not include hearsay statements made by Fitcher. Crozier testified to what he had seen and experienced personally; not what someone else had told him. Thus, Pafford's trial counsel was under no obligation to make a Confrontation Clause objection because Crozier's testimony did not repeat anything Fitcher had said.

### G. *Motion for Mistrial*

 For the second ineffective assistance of counsel claim, Pafford asserts that in certain situations, a statement can be so prejudicial that a mistrial is the only remedy when the error cannot be cured by an instruction. Pafford points to Crozier's testimony that alluded to the fact that there were other victims; for example, Crozier testified, "I've seen things happen with other people that will not testify against him," and "Every person that I named has had something happen to them. They just do not want to be up here." Harrelson, Pafford's trial counsel, testified at the motion-for-new-trial-hearing that he did not object to these statements because he did not want to draw more attention to the fact that there were other victims. He noted that he did make some objections and approached the bench but that he thought it better strategy at times not to do so. This was not unreasonable for counsel to do. Regardless, the record contains testimony from more than just the victim to corroborate the allegation, and Pafford fails to analyze how this prejudicially affected him. Thus, the circuit court properly found Harrelson's conduct did not constitute ineffective assistance of counsel.

Affirmed.

Abramson and Brown, JJ., Agree.