RITA W. GRUBER, Chief Judge
This case returns to us after we ordered rebriefing. Lewis v. State , 2018 Ark. App. 433, 2018 WL 4610802. Ronald Lewis was found guilty by a Benton County Circuit Court jury of one count of rape and two counts of second-degree sexual assault for sexual misconduct with two minor boys. The jury sentenced him to forty years' imprisonment for the rape and five years' imprisonment for each count of sexual assault, to be served consecutively to each other and to the rape conviction. Lewis does not challenge the sufficiency of the evidence but brings two points on appeal challenging the testimony of one witness, Det. Travis Monson. Lewis argues that Detective Monson's testimony regarding appellant's right to remain silent violated his right against self-incrimination and his testimony by remote video violated appellant's right to confrontation. We hold that there is no error requiring reversal, and we affirm his convictions.
Because appellant does not challenge the sufficiency of the evidence, only a brief recitation of the facts is necessary. Appellant was close friends with Shannon and Tim Barnhart, parents of CB, one of the victims in this case. The Barnharts considered appellant, and appellant considered himself, to be a surrogate grandfather to CB. The second victim, BD, was CB's best friend. Appellant lived in Missouri, but he performed construction work for Tim Barnhart in and around Springdale, Arkansas, where the Barnharts lived.
Sometime in 2013, appellant discovered that CB, who was around nine or ten years old at the time, played baseball, and appellant told the Barnharts that he would like to come see the games. Shortly thereafter, appellant began attending CB's games and *500 later started spending the night with the Barnharts when there were early morning games or weekend-long tournaments, at first on the living room couch and later on a mattress on the floor in CB's room. CB and appellant began spending more and more time together fishing, bowling, miniature golfing, and pursuing other similar sporting activities. This went on for several years, and appellant continued to spend more and more nights in the Barnharts' home. Sometime in 2015, CB's brothers moved out of the house, and CB moved into the vacated room. Appellant, who by then spent most nights at the Barnharts' home, stayed in CB's old room. In the summer of 2016, the Barnharts noticed that CB's attitude toward appellant had changed. They testified that he did not want to be around appellant; he did not want to sit by him; and he no longer laughed at his jokes. When the Barnharts questioned him, CB initially denied that appellant had ever touched him inappropriately; however, that summer he eventually admitted to them that appellant had touched him inappropriately.
CB later disclosed in an interview with a Springdale Police Department detective that he had known appellant for several years, trusted him, and considered him a "best friend." He described the incidents of sexual abuse to the Arkansas State Police child investigator and to the detective. CB also told the detective that BD had spent the night and that appellant had also touched BD inappropriately. BD admitted to the investigator and to the detective that appellant had touched him inappropriately. After a trial at which both of CB's parents, CB's uncle, BD's mother, two detectives, CB, BD, and appellant testified, a jury convicted appellant of one count of rape and two counts of second-degree sexual assault. Appellant filed this appeal.
I. Fifth Amendment Right
For his first point on appeal, appellant contends that his Fifth Amendment right against self-incrimination was violated by Detective Monson's comments during the detective's testimony on appellant's silence. The State had sought and obtained a search warrant to search appellant's phone for data, including text messages, photos, emails, files, internet history, and other information. Detective Monson performed the data extraction on appellant's phone. As this raises an issue of constitutional interpretation, our review is de novo. Swain v. State , 2015 Ark. 132, at 5, 459 S.W.3d 283, 285.
At trial, Detective Monson testified that he is a forensic officer with the Springdale Police Department and was assigned to the Internet Crimes Against Children Task Force in Fayetteville. He said that his primary function was to do forensic examinations and reports on cell phones, computers, and other digital devices from which data could be extracted. He then explained the three methods he used in extracting the information-including a logical extraction, a file-system extraction, and a physical extraction-depending on the phone's make, model, and software. He testified that he had performed an "advanced logical" on appellant's iPhone and was able to retrieve some videos and photos but no text messages. He testified that once the report was completed, it prompted for the "encryption passcode." At that point, defense counsel asked to approach the bench, explaining that he was concerned the witness was going to violate appellant's Fifth Amendment right not to self-incriminate by testifying that appellant refused to provide the passcode associated with his iPhone. The prosecutor said that she did not intend to ask the witness whether he asked appellant to provide the passcode, and examination of the witness *501 continued. Detective Monson explained that it was possible that he had not been able to view all the information on the phone because it prompted him for an encrypted password, which he did not have. He said that he was able to extract over 100 images of CB from the phone. The State introduced six of those photos into evidence. They included photos of CB doing homework, CB sleeping, and a close-up of CB's face. At that point, the following colloquy occurred:
PROSECUTOR : I want to talk just a little bit about we talked about [appellant's] phone and how it's possible that you may not be able to get deleted messages off of the phone. Is that true for all iPhones?
WITNESS : No. I mean, there is-there is a chance, a small possibility. But in the case with [appellant's] phone, and without giving up the encryption password, I was only-
Defense counsel objected, at which point both counsel approached the bench.
DEFENSE COUNSEL : Your Honor, similar to what-he just said it. He said without [appellant] giving up his password.
PROSECUTOR : I wasn't trying to elicit that.
DEFENSE COUNSEL : Oh, no. I'd like to move to strike what he said.
THE COURT : Look, here's the thing. In opening statement, you talked about the only testimony, the only evidence this jury is going to hear is the testimony from these boys. Okay. And for him to not have the data I guess my point is I don't see a I think you're saying a Fifth Amendment right to not do that.
PROSECUTOR : Your Honor, the search warrant-
THE COURT : That's why we got a search warrant. I guess I am having difficulty with-
DEFENSE COUNSEL : Your Honor, I think we were fine with before. There is more to it but this time.
THE COURT : You are asking me to strike what he just said. My point is I have difficulty striking it because it explains what Detective Monson had to do and he did it by a magistrate going over the probable cause, granting the search warrant, and doing so.
DEFENSE COUNSEL : Your Honor, he-he didn't have to get a search warrant because [appellant] wouldn't give him the password. He had to get a search warrant because [appellant] wouldn't give him the phone.
PROSECUTOR : I think, Your Honor, there will be testimony that-we don't know his testimony, what he would say. And so I think it is imperative that we show that we tried to do what we could to get this.
THE COURT : I'm going to overrule your objection. I think-I think it explains what he's able to do. If you need to go through cross-examination explain he's got a constitutional right to do so. I will certainly admonish the jury that he has a constitutional right. I'll be glad to do that now.
DEFENSE COUNSEL : I think at the very least, that would help.
THE COURT : Do you want me to do that?
DEFENSE COUNSEL : Yes, Your Honor.
Whereupon the proceedings at the bench were concluded, and the court gave the following admonishment to the jury.
THE COURT : All right, folks, I am going to go ahead and just give you what is called an admonishment. And what it is, is Detective Monson had said something about the passcode and that [appellant] had not provided the passcode. Okay. You need to understand *502 [appellant] has an absolute, constitutional, guaranteed by both the United States Constitution and the Arkansas Constitution, to not incriminate himself under the Fifth Amendment. He has that absolute right to not provide that information. Do you all understand?
The State resumed direct examination of Detective Monson and admitted a photo of CB taken from appellant's phone that appeared to have been posted on Facebook, but the State did not ask any questions about the extraction process or appellant's passcode.
On appeal, appellant argues that he had the absolute right under the Fifth Amendment not to provide the State with the passcode to his iPhone and that Detective Monson's reference to his exercise of that right was an improper comment on his right to remain silent. In support of his argument, he cites the United States Supreme Court's decision in Griffin v. California , 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and our supreme court's opinion in Jones v. State , 340 Ark. 390, 10 S.W.3d 449 (2000). Griffin , and Jones in reliance on Griffin , prohibits comment on a defendant's failure to testify at trial and is thus not relevant here. Appellant testified at trial, and any comments by Detective Monson related to silence before the trial, not during. But as the State properly asserts, the Supreme Court has held that the Fifth Amendment also prohibits certain uses of a defendant's postarrest silence to later impeach him at trial. Doyle v. Ohio , 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
In Doyle , prosecutors cross-examined defendants about their post-Miranda silence and asked why they told an exculpatory story for the first time at trial. The Supreme Court held that this was reversible error because it "would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. " Id. at 618, 96 S.Ct. 2240 (emphasis added). Doyle does not, however, prohibit all comments on a defendant's postarrest silence. When a comment on a defendant's postarrest silence is not an attempt to impeach the defendant, it is not the type of comment prohibited by the Court in Doyle . Sylvester v. State , 2016 Ark. 136, at 11, 489 S.W.3d 146, 152-53 ; see also Ferrell v. State , 325 Ark. 455, 463, 929 S.W.2d 697, 703 (1996) ; Davis v. State , 345 Ark. 161, 176, 44 S.W.3d 726, 735 (2001). Further, a witness's inadvertent reference to, rather than a prosecutor's direct comment on, a defendant's postarrest silence does not implicate the protections afforded by Doyle . Robinson v. State , 348 Ark. 280, 290, 72 S.W.3d 827, 834 (2002) ; see also Tarkington v. State , 313 Ark. 399, 55 S.W.2d 306 (1993) (holding that there was no Doyle violation when there was no comment or question by the prosecutor about a defendant's postarrest silence but rather an inadvertent reference to the defendant's silence by a witness).
In this case, the prosecution did not comment on appellant's failure to turn over his iPhone passcode in either its opening statement or its closing argument. The only mention of this failure was by a witness, Detective Monson, in response to a question about his process in extracting information from a phone. He said that there was a small chance that he could recover deleted messages from a phone but "not without giving up the encryption password." After defense counsel moved to strike the statement, the court offered-and defense counsel accepted the offer-to admonish the jury that appellant had a constitutional right not to provide the passcode to his phone. This incident was in no *503 way an impeachment of some explanation appellant had offered at trial as in Doyle , and it was not a manifest intent to comment on appellant's silence. Rather, it was an inadvertent comment by a witness in explaining to the jury his work to extract information from appellant's phone. Moreover, following the court's admonishment to the jury, the prosecutor did not dwell on the reference or elicit any further comment about it. We hold this was not an improper comment on appellant's silence contemplated by Doyle , and the court's refusal to grant appellant's motion to strike the comment was not reversible error
II. Sixth Amendment Right
For his second point on appeal, appellant contends that his Sixth Amendment right to confront the witnesses against him was violated by Detective Monson's remote testimony through two-way live video. Detective Monson was not available to testify at trial because he was at a week-long work conference in Las Vegas. Appellant objected to the court's allowing Detective Monson to testify by live remote through GoTo Meeting. The court overruled appellant's objection, reasoning as follows:
THE COURT : I understand your objection, Mr. Faught. This is going to be the Court's ruling on this. The Sixth Amendment of the United States Constitution and the Arkansas Constitution guarantees that all criminal prosecutions the accused shall enjoy the right to be confronted with the witnesses against him. This confrontation clause applies to both federal and state prosecutions. Here, Officer Travis Monson is unavailable to appear in person because he's attending I want to call it a required continuing legal education, but it's required for his job as a person who extracts information from phone and technical apparatuses. But Detective Monson is able to appear live via a remote access. In fact, I think we're using GoToMeeting. He will be subject to the Defendant's cross-examination.
Furthermore, as I am looking on the screen I see Detective Monson very clearly.... [The screen] is huge and can be seen by both the defendant, the defendant's counsel, and by the jury. In fact, I have an HDTV that is right in front of the jury box that's for them to also see that. So, the jury, the defendant, the defendant's counsel will all be able to observe, in real time, Detective Monson's tones, his demeanor, his body language, his facial expressions all in real time. Thus, this court rules that it is protection of the defendant's absolute constitutional right to confront witnesses against him. So, your objection is denied or overruled.
The Confrontation Clause in the Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. Article 2, section 10 of the Arkansas Constitution repeats that same right of confrontation. We have consistently interpreted both clauses to provide identical rights. Smith v. State , 340 Ark. 116, 119, 8 S.W.3d 534, 536 (2000). The United State Supreme Court held in Coy v. Iowa , 487 U.S. 1012, 1016, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." Two years later, in a case involving the use of one-way video testimony of a child who was a victim of sexual abuse, the Court held that the Confrontation Clause does not guarantee criminal defendants an absolute right to a face-to-face *504 meeting with witnesses against them. Maryland v. Craig , 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The Court emphasized, however, that the preference is a strong one and that a defendant's Sixth Amendment confrontation right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Id. at 850, 110 S.Ct. 3157.
Neither the United States Supreme Court nor the appellate courts in Arkansas have addressed whether Craig applies to a situation not involving a child victim of sexual abuse and involving the use of two-way video rather than one-way video. The Eighth Circuit held that the holding in Craig controls two-way systems as well as one-way systems. United States v. Bordeaux , 400 F.3d 548 (8th Cir. 2005). In affirming its earlier holding on the issue, the Eighth Circuit reasoned:
It is true that a two-way closed-circuit television creates an encounter that more closely approximates a face-to-face confrontation than a one-way closed-circuit television does because a witness can view the defendant with a two-way system. But two-way systems share with one-way systems a trait that by itself justifies the application of Craig : the "confrontations" they create are virtual, and not real in the sense that a face-to-face confrontation is real.
The virtual "confrontations" offered by closed-circuit television systems fall short of the face-to-face standard because they do not provide the same truth-inducing effect. The Constitution favors face-to-face confrontations to reduce the likelihood that a witness will lie. "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' " Coy v. Iowa , 487 U.S. 1012, 1019, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). Given the ubiquity of television, even children are keenly aware that a television image of a person (including a defendant in the case of a two-way system) is not the person[.] [S]omething is lost in the translation. Thus, a defendant watching a witness through a monitor will not have the same truth-inducing effect as an unmediated gaze across the courtroom. ... Admittedly, the "confrontation" offered by a one-way system is, for lack of a better phrase, even more virtual because it depends on the witness envisioning the defendant to create the "confrontation." And one can imagine that this incremental step away from face-to-face confrontations results in a further diluted truth-inducing effect. That said, the touchstone for deciding whether a "confrontation" satisfies the Constitution is whether it is likely to lead a witness to tell the truth to the same degree that a face-to-face confrontation does, and in this respect two-way systems are like one-way systems: they both fall short.
Id. at 552.
We find the reasoning of the Eighth Circuit persuasive and that Craig governs the situation here. Craig makes clear that video testimony is an exceptional procedure to be used only in exceptional circumstances. In the case at bar, the circuit court appeared to make a finding that the reliability of the testimony was "otherwise assured" under Craig . The circuit court did not, however, state clearly what important public policy justified violating appellant's Sixth Amendment right to confront the witnesses against him, so we can only speculate. And while we are not prepared to expound on what might constitute such an important public policy, other than the testimony of a child victim of sexual *505 abuse, we do not believe that the situation here rises to the exceptional circumstance contemplated by the Court in Craig . We hold that the remote testimony of Detective Monson violated appellant's rights under the Confrontation Clause.
Trial error, however, even involving the Confrontation Clause, is subject to a harmless-error analysis. Sparkman v. State , 91 Ark. App. 138, 208 S.W.3d 822 (2005). To conclude that a constitutional error is harmless and does not mandate a reversal, our court must conclude beyond a reasonable doubt that the error did not contribute to the verdict. Id. When determining whether the denial of a party's right to confront witnesses is harmless error, our court must consider factors such as the importance of the witness's testimony, whether the testimony was cumulative, whether there was corroborating or contradicting evidence, and the overall strength of the State's case. N.W. v. State , 2015 Ark. App. 57, at 11, 454 S.W.3d 271, 278.
Detective Monson had no personal interactions with either of the victims in this case or with appellant. His only role was to extract information from appellant's iPhone. At trial, Detective Monson principally testified about the procedures generally used to extract such information and about the procedures he used on appellant's phone specifically. He also said that he retrieved numerous pictures of CB from appellant's phone, but only six of those photos were admitted into evidence, in addition to one photo of CB with a caption that was posted on appellant's Facebook account. Neither his testimony about the photos nor the photos themselves involved sexual misconduct or inappropriate behavior.
Mr. Barnhart testified about the close relationship between CB and appellant from 2012 through 2015. He said that CB's attitude changed in 2016 and that CB did not want to be around appellant. Mr. Barnhart said that in August 2016, CB told him appellant had "touched" him. Mrs. Barnhart testified that she had been concerned about CB's relationship for a while before CB finally admitted to her that appellant had touched him inappropriately. She said that she could tell something was wrong with CB and that she had noticed changes in his demeanor and behavior. The State admitted one photo of CB through her testimony. She also identified CB in all the photographs that were later admitted in Detective Monson's testimony. Of the six photos admitted through Detective Monson, Mrs. Barnhart testified that she had taken two of the photos, which she had posted on her social media accounts.
CB's uncle, Brandon Klein, testified that he had known appellant for twenty years as a family friend and had worked with him for several years. He said that he was appellant's friend on Facebook and had seen appellant's post of a photo of CB on July 28, 2016. The caption with the post stated: "This is my best friend. I've known him for about three years, and I miss him so much. It has been the biggest misunderstanding in my whole life." Although the Facebook post and photo had already been admitted through Detective Monson's testimony, the State also admitted it through Mr. Klein's testimony.
Finally, both victims testified in detail about their relationship with appellant. BD testified that appellant had given him a back rub when he spent the night at CB's house and that appellant had "tried to grab [his] penis" when he turned over onto his back. He said that appellant "touched my penis with his hand, I had clothes on, and he went under my clothes." BD said he told appellant to stop, which he did, and appellant told BD the next morning that *506 he was sorry and it would not happen again.
CB testified that appellant would often rub his back when he was sleeping and sometimes he would go lower "and touch my butt." He also said that a "couple of times" appellant would grab his stomach and then go "lower" and "rub my penis with his hand." He said appellant never pulled CB's pants down at night but he "would pull my pants down at other times, during the day." He said when appellant pulled CB's pants down, his penis would be out of his clothing. CB also testified that appellant put CB's penis inside his mouth. Appellant told CB that if he told anyone they would put appellant in jail. CB testified that initially he did not admit this to his mother when she asked if appellant had done anything to make him feel uncomfortable because he liked appellant and did not want him to go to jail.
Det. Thomas Wooten with the Springdale Police Department testified that he had interviewed both boys and that both had told him appellant had touched them inappropriately. He said that he specifically asked BD if appellant had touched his penis inside his underwear, and BD said yes. He also interviewed appellant, who told Detective Wooten that he was close friends with the Barnharts, had been sleeping on CB's floor on a mattress right next to CB, and had often rubbed CB's back to get him to sleep at night. Detective Wooten asked appellant if he had ever accidentally touched CB's penis, and appellant answered that if he had, he must have been asleep. Detective Wooten testified that he obtained a warrant to search appellant's phone and that Detective Monson had performed an extraction on the phone. Detective Wooten said that he saw a lot of photos of CB and a few photos of other boys he did not know from Detective Monson's report on the extraction.
In light of both victims' detailed testimony of the sexual misconduct, which is sufficient to support the convictions, coupled with the additional testimony of both victims' mothers, Mr. Barnhart, Detective Wooten, CB's uncle, and the additional photos that were introduced outside of Detective Monson's testimony, we hold that the violation of appellant's right to confront Detective Monson was harmless error.
Affirmed.
Hixson and Brown, JJ., agree.