Cite as 2019 Ark. App. 450

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** CR-18-955

| | |
|---|---|
| LENIN ALEJANDRO-ALVAREZ<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **OPINION DELIVERED:** OCTOBER 16, 2019<br><br>APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT<br>[NO. 17CR-16-842]<br><br>HONORABLE GARY COTTRELL, JUDGE<br><br>AFFIRMED |

## ROBERT J. GLADWIN, Judge

Appellant Lenin Alejandro-Alvarez appeals his convictions on charges of rape and sexual assault in the second degree. He argues that the circuit court violated his Sixth Amendment Confrontation Clause right to confront his accuser. Although we find merit in appellant's argument that the circuit court erred by allowing a substitute analyst to testify on the "data analysis" he performed on the results of the initial analyst's work, we nevertheless affirm because this error was harmless.

## I. *Facts*

In August 2016, appellant and his wife, Maria Carmen del Rodriguez Hernandez (V.C.'s biological mother), registered V.C. for fifth grade at City Heights Elementary School in Van Buren. During the registration process, V.C. told the school's assistant principal, Aimee McCabe, that she was pregnant. Ms. McCabe, a mandated child-abuse reporter, called the child-maltreatment hotline. Van Buren police detective Jonathan Wear

subsequently observed an interview of V.C. conducted at Hamilton House in Fort Smith by a sexual-assault nurse examiner, Ruth Dudding.

Detective Wear arrested appellant following the interview, and the State charged him in an information filed September 19, 2016, with rape (victim less than fourteen years of age) pursuant to Arkansas Code Annotated section 5-14-103(a)(3)(A) (Supp. 2017), a Class Y felony; and sexual assault in the second degree (with a person less than fourteen years of age) pursuant to Arkansas Code Annotated section 5-14-125(a)(3), a Class B felony.

After V.C. gave birth to baby K. in January 2017, buccal swabs from the cheeks of V.C., K., and appellant were collected by Melea McCormick, another sexual-assault nurse examiner at Hamilton House. Detective Wear picked up those swabs and delivered them to the Arkansas Crime Laboratory for a paternity determination. Appellant filed a notice under Arkansas Code Annotated section 12-12-313(d)(2) (Supp. 2015) to compel the presence at trial of any person who "performed any analysis upon any evidence submitted by the State or law enforcement, which is to be submitted as evidence against [appellant]." The State ultimately disclosed Maddison Harrell, a forensic DNA examiner with the Arkansas Crime Laboratory, who served as the administrative reviewer of the work of Julie Butler, the analyst who had performed the paternity test but had moved to North Carolina before trial. A motion in limine was filed regarding the proffered expert witness, Harrell, the substitute analyst for Butler.

At trial, the circuit court qualified Harrell as an expert in forensic DNA analysis. Harrell acknowledged that he did not perform the "initial testing" on the buccal swabs—meaning that he did not "perform the lab work" for the case—which had been performed

2

by Butler. Harrell explained that he had performed a "data analysis" on the results of Butler's work—he "looked at all the data and did a complete comparison" between the DNA found in K.'s buccal swab and appellant's buccal swab, "just like I would with any other case." He testified that he looked at the raw data and every piece of documentation and conducted a complete review of everything in the case. Harrell indicated that every step of Butler's lab work was documented, including "where it was done[,] . . . which reagents[1] were used[,]" and the "physical location" where each step in the process took place. Harrell testified that he was able to determine, through reviewing Butler's raw data, that Butler had conducted the initial testing correctly. Harrell testified that based on his raw-data review, he was able to come to his own conclusion as to the results of the DNA analysis and that he "reached the same conclusion that [Butler] did."

Harrell confirmed that he documented his findings in a report, and that report was admitted into evidence over the objection of appellant's counsel. Harrell's report contains an attestation that reads, in pertinent part, that the report's results "relate only to the items tested and represent the interpretations/opinions of the undersigned analyst." Harrell's opinion was that appellant "cannot be excluded as the biological father of [K.] when you take into consideration the contribution of [V.C.,]" that is, the matches between K. and appellant on the DNA markers identified in his report were 785 billion times more likely to occur if appellant was K.'s father than they would if he was not her father.

On cross-examination, Harrell described how Butler had created the data that he analyzed to form his opinion about K.'s paternity. He testified that Butler would have taken

---

[1]A substance or mixture for use in chemical analysis or other reaction.

a sample from each swab, placed them in a centrifuge, extracted the DNA from them, and generated a profile from the resulting samples. Harrell testified that Butler would have then compiled the results of her DNA analysis in a report. He confirmed that Butler's report, which was not offered into evidence, was retained after Butler's departure from the crime lab, as were the swabs. Harrell confirmed that he did not retest the swabs himself.

On redirect, Harrell testified that "[i]t's not unusual for our laboratory to have multiple people perform physical steps of the laboratory work and then have one person do the analysis for the case file." Harrell explained that the process of separating lab work from analysis was "not uncommon at our crime lab or other crime labs throughout the country."

With the aid of an interpreter, Ms. Hernandez testified at trial that she and her family had lived in Mission, Texas. She explained that in January 2016, appellant went north to find work and settled in Van Buren, Arkansas. Ms. Hernandez sent V.C. to Van Buren in March 2016, and she followed in August 2016. Two days after she arrived in Van Buren, appellant told Ms. Hernandez that V.C. was pregnant. V.C. had her baby, K., on January 5, 2017. Ms. Hernandez immediately suspected appellant of being the father, but being new to Arkansas, she did not report her suspicions to the police.

Ms. Hernandez read a letter that appellant had written her after his arrest. In it, he asked Ms. Hernandez to "forgive [him] for all the hurt [he] caused" and to take care of his children—both his biological son, J., and K.—and to "[t]alk to [J.] always about [him], what happened with the girl, because it was an accident."

V.C. testified that appellant had molested and raped her after she arrived in Van Buren. V.C. described how, besides showing her pornography, appellant had touched her

4

legs, chest, and vagina with his hands. She testified about being penetrated by him many times and that he ejaculated inside her. She described the pain caused by his penetration, stating that she cried, screamed, and told her stepfather "no" when he raped her. She told the jury that appellant would stop if she cried, wait until her pain subsided, and then "he would start all over again." V.C. also related an instance when appellant raped her because he told her that he did not feel well and thought it would make him feel better. V.C. further testified that appellant told her to tell the sexual-assault investigators at Hamilton House that she had gone back to Mexico during the summer when K. was conceived. She stated that she obeyed him out of fear but that it was a lie. V.C. identified K., the child that she alleged was conceived by appellant.

At the close of the State's case, appellant moved for a directed verdict, arguing that the State had not made a prima facie case with respect to both the rape and sexual-assault allegations that appellant had violated any of the statutes within the jurisdiction of Crawford County. The circuit court denied the motion as well as the renewed motion for directed verdict made at the close of all the evidence.

Appellant was found guilty on both felony charges and sentenced to an aggregate sixty-year term of imprisonment pursuant to a sentencing order filed on May 11, 2018. A timely notice of appeal was filed on May 16, 2018.

## II. *Standard of Review*

Although the admission of expert testimony is reviewed for an abuse of discretion, *see, e.g.*, *Pafford v. State*, 2017 Ark. App. 700, at 11, 537 S.W.3d 302, 309, questions of constitutional interpretation, such as whether there has been a violation of the

5

Confrontation Clause, are reviewed de novo. *E.g.*, *Raquel-Dieguez v. State*, 2015 Ark. App. 626, at 5, 475 S.W.3d 585, 589.

## III. *Discussion*

Appellant argues that his Sixth Amendment right to confront his accuser was denied when the substitute analyst provided testimony regarding the results of a DNA test performed at the crime lab. Over the objection of appellant's counsel, the substitute analyst was allowed to testify in contravention of *Bullcoming v. New Mexico*, 564 U.S. 647 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *Crawford v. Washington*, 541 U.S. 36 (2004), and their progeny.

The Sixth Amendment's Confrontation Clause ensures that "[i]n all criminal proceedings, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford*, 541 U.S. at 42. *Crawford* instructs, "[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Id.* at 50. The core class of testimonial statements includes ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used by the prosecution. *Id.* at 51.

In *Melendez-Diaz*, the United States Supreme Court expanded *Crawford* by addressing whether forensic analysts must testify in person about their laboratory reports and determining that "certificates of analysis"—sworn affidavits indicating that substances had been analyzed and were found to be cocaine—by analysts who did not testify at trial were

6

testimonial in nature, thereby implicating Melendez-Diaz's right of confrontation. 557 U.S. at 310–11.

Two years later, in *Bullcoming*, the Supreme Court reviewed the prosecution's introduction of forensic reports containing "a testimonial certification, made in order to prove a fact at a criminal trial." 564 U.S. at 657. In that case, the analyst who performed the tests was on unpaid leave for an unrevealed reason, and another analyst from the same lab testified about the tests. *Id.* at 655–56. The Court held that analysts who write reports that the State introduces must be made available for confrontation. *Id.* at 663.

Pursuant to Ark. Code Ann. § 12-12-313(d)(2), appellant filed a timely formal notice demanding the presence of all forensic analysts who had tested the substance for purposes of cross-examination. Once a defendant makes this demand, it becomes the State's "burden of either producing the witness for cross-examination or requesting a continuance in order to produce him." *Hendrix v. State*, 40 Ark. App. 52, 58, 842 S.W.2d 443, 446 (1992).

Similar to *Bullcoming*, in this case, the State called an analyst who did not actually run the analysis but rather reviewed the data performed by the absent analyst. While this analyst did submit his own report, that report was not the actual analysis of the forensic test. Harrell testified that he "conducted his own analysis of the previously generated results." He specifically acknowledged that his work and results were "exclusively dependent" on the work of the prior analyst who had actually performed the physical laboratory work.

This court looked at a similar, but distinct, issue in *Raquel-Dieguez*, *supra*, but in that case, the analyst retested the forensic samples prior to testifying because the first analyst was unable to travel to testify for medical reasons. In *Raquel-Dieguez*, we noted that the retesting

7

was necessary to make the second analyst competent to testify. In the instant case, the report introduced is merely an analysis of the report of the analyst who performed the test. By Harrell's own admission, his report was an analysis of the previous testing, looking at the results of that test, and taking that initial data as properly tested. The data was not retested as in *Raquel-Dieguez*.

We hold that the admitted report is testimonial in nature, and it was not explained by the person who actually ran the analysis. Accordingly, it should not have been allowed as an attempt by the State to circumvent *Bullcoming*, *Melendez-Diaz*, and ultimately *Crawford*. The governing case law consistently indicates that the testimony must be by an analyst who performed the analysis at issue, not someone who merely reviewed the data. Allowing Harrell's testimony and admitting the related DNA–evidence data report violated appellant's right to confront his accuser.[2]

Despite the circuit court's Confrontation-Clause error arising from Harrell's testimony about K.'s paternity, we affirm the conviction and hold that the error was harmless beyond a reasonable doubt. *E.g.*, *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Lewis v. State*, 2019 Ark. App. 43, at 12, 571 S.W.3d 498, 505. The factors in a harmless-beyond-

---

[2]We acknowledge the most recent United States Supreme Court authority on the Confrontation Clause and forensic–report testimony, *Williams v. Illinois*, 567 U.S. 50 (2012), in which a plurality of the Court found that an expert's testimony—that a DNA profile produced by an outside laboratory matched a profile that the state crime lab created from a sample of Williams's blood—did not violate the Confrontation Clause. Although in *Williams*, there were five votes to approve the admission of the report in question, the Court could not settle on a specific or particular reason why. *See id.* at 120 (Kagan, J., dissenting). The lack of common ground between the plurality opinion and Justice Thomas's opinion concurring in the judgment renders *Williams* of questionable utility. *See, e.g.*, *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013).

a-reasonable-doubt analysis include "the importance of the witness's testimony, whether the testimony was cumulative, whether there was corroborating or contradicting evidence, and the overall strength of the State's case." *Lewis*, 2019 Ark. App. 43, at 12, 571 S.W.3d at 505; *see also, e.g.*, *Van Arsdall*, 475 U.S. at 684. These factors weigh heavily in favor of holding that the error was harmless.

The vital evidence in this case did not come from Harrell or his report; rather, it came directly from appellant's rape victim, V.C. Her vivid description of being raped repeatedly and painfully by appellant constituted sufficient evidence to sustain the convictions of rape and second-degree sexual assault. *See Mondy v. State*, 2019 Ark. App. 290, 577 S.W.3d 460. That proof is separate from the ancillary question of whether a child resulted from any single act of rape—all that Harrell's paternity-establishing testimony sought to do. Our supreme court recently reiterated that "in rape cases, we have held that there is sufficient evidence to support a conviction if the victim gives 'a full and detailed accounting of the defendant's actions.'" *Rogers v. State*, 2018 Ark. 309, at 9, 558 S.W.3d 833, 839 (citing *White v. State*, 367 Ark. 595, 599, 242 S.W.3d 240, 249 (2006)). Uncorroborated testimony of a rape victim is sufficient evidence to support a conviction. *See Rogers*, 2018 Ark. 309, at 9, 558 S.W.3d at 839 (citing *Gillard v. State*, 366 Ark. 217, 221, 234 S.W.3d 310, 313 (2006).

We hold that Harrell's testimony was cumulative as well. At most, Harrell's paternity testimony and associated report established a single act of rape—the one in which K. was conceived. V.C., however, testified to multiple rapes and sexual assaults that appellant inflicted on her over the approximately six-month period during which she lived alone with

9

appellant in Arkansas. She also provided undisputed testimony that appellant told her to lie to investigators that she had been in Mexico during the summer when the baby was conceived. Finally, Ms. Hernandez read the letter that appellant had written to her after his arrest incriminating himself of wrongdoing and asking for her forgiveness. The State's case against appellant was overwhelmingly strong even without Harrell's testimony. Any Confrontation Clause error, accordingly, was harmless beyond a reasonable doubt.

Affirmed.

ABRAMSON and WHITEAKER, JJ., agree.

*Lisa-Marie Norris*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christian Harris*, Ass't Att'y Gen., for appellee.